# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ANGELLA PETERS, *et al.*,

        Plaintiffs,

        v.

DISTRICT OF COLUMBIA,

        Defendant.

Civil Action No. 09-cv-02020 (BAH)
Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

Plaintiffs are nine current and former employees of the District of Columbia's Child and Family Services Agency ("CFSA"), who assert that the CFSA "discriminated against them and similarly situated employees on the basis of their race, national origin, age, and/or in retaliation for complaining about discriminatory practices." Second Amended Complaint ("Compl."), ECF No. 17, at 2. As a consequence of CFSA's alleged discriminatory and retaliatory actions, plaintiffs claim that they are entitled to damages under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 633a(a), the District of Columbia Human Rights Act ("DCHRA"), and 42 U.S.C. §§ 1981 and 1983.

Pending before the Court are (1) the defendant's motion, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss plaintiffs' Second Amended Complaint, and (2) two motions, pursuant to Rule 24 of the Federal Rules of Civil Procedure, for leave to permit nine additional current and former employees of CFSA to intervene as plaintiffs in this action. All together, the plaintiffs' Complaint and proposed intervenors' Complaints-in-intervention amount to over one hundred pages and over one thousand numbered paragraphs. They have alleged such

a plethora of facts that they have made clear their success on the merits is impossible.  For the

reasons set forth below, the Court finds that the claims of six plaintiffs are barred by *res judicata*

or failure to meet the procedural prerequisites for bringing this action, and the claims of the three

remaining plaintiffs fail to state cognizable causes of action.  Consequently, the defendant's

motion to dismiss is granted and the motions to intervene are denied.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      Procedural History

Two plaintiffs, Angella Peters[1] and Larry McCall, initiated this lawsuit on October 28,

2009, alleging that the District of Columbia violated their rights under the Due Process Clause of

the Fifth Amendment to the United States Constitution, for which they sought damages under 42

U.S.C. §§1981 and 1983.  Shortly thereafter, the plaintiffs filed an amended complaint adding

four plaintiffs — Maria Dyson, Augustine Ekwem, Jacqueline Moore and Katherine Washington

— as well as claims under Title VII of the Civil Rights Act of 1964, the ADEA, and the

DCHRA.  On March 16, 2010, the Court granted the plaintiffs' unopposed motion for leave to

file a Second Amended Complaint,[2] which added three more plaintiffs: Joan Simpson, Melva

Meade, and Cynthia Courts-Marshall.[3]  *See* Minute Order (Mar. 16, 2010) (Sullivan, J.).[4]

---

[1] There is discrepancy in the briefing material from the plaintiffs about the spelling of the lead plaintiff's first name (she is sometimes referred to as "Angela" and other times referred to as "Angella").  The Court will refer to Ms. Peters as "Angella," which is how her named is spelled in the Second Amended Complaint.  *See* ECF No. 17.

[2] For ease of reference, the Second Amended Complaint, ECF No. 17, which is at issue in the pending motion to dismiss, will be cited as "Compl." herein.

[3] Although the defendant initially opposed the filing of the Second Amended Complaint as futile, the defendant withdrew its opposition and instead "decided the most efficient way to address the procedural and substantive deficiencies . . . would be to file a comprehensive Motion to Dismiss in response to this pleading. . . ."  Def.'s Mem. in Opp'n to Mot. to Amend, ECF No. 15, ¶ 7.

[4] This case was re-assigned to the current presiding Judge on January 21, 2011.

The plaintiffs have continued to seek leave to add plaintiffs to this action.  On July 23, 2010, and again on April 22, 2011, the plaintiffs moved, pursuant to Federal Rule of Civil Procedure 24, to allow a total of nine additional putative plaintiffs to intervene.  These motions to intervene are opposed by the defendant and have been denied by Order entered on March 30, 2012.  This Memorandum Opinion sets forth the reasons for that Order.

**B.     Allegations in Second Amended Complaint**

The nine plaintiffs named in the Second Amended Complaint are black women and men who have worked as caseworkers and supervisors at the CFSA for varying lengths of time, ranging from three to eighteen years.  Four of the plaintiffs are current or former caseworkers and the other five plaintiffs are current or former supervisors.  The four caseworker plaintiffs (Angella Peters, Larry McCall, Maria Dyson and Katherine Washington) complain primarily about the allegedly abusive and discriminatory conduct directed at them by a single supervisor. Three of these caseworker plaintiffs apparently remain employed at CFSA: both Maria Dyson and Katherine Washington remain caseworkers in Child Protective Services ("CPS"), a component of CFSA, and Larry McCall's current assignment is not identified.  The five management plaintiffs (Cynthia Courts-Marshall, Jacqueline Moore, Joan Simpson, Augustine Ekwem and Melva Meade), complain about the conduct of at least eight other managers at CFSA, including the CFSA Deputy Director of Operations, for allegedly creating a hostile work environment, and discriminatory and retaliatory conduct.  Two of the management plaintiffs (Augustine Ekwem and Melva Meade) remain employed at CFSA, while the other three management plaintiffs (Cynthia Courts-Marshall, Jacqueline Moore and Joan Simpson) are no longer employed at CFSA.

The Second Amended Complaint asserts two core allegations against CFSA: first, "[f]rom as early as 2001, the Child and Family Services Agency had a custom of allowing its supervisors to bully older, black social workers, particularly those from Africa or the Caribbean Islands," and this conduct created a hostile work environment that management condoned. Compl. at 2.  Second, CFSA, from as early as 2003, "had a custom of allowing its supervisors to retaliate against social workers who complain about discriminatory practices." *Id*.  The alleged retaliatory actions against the plaintiffs took different forms, ranging from re-assignment of duties to demotion in position to the unfair assignment of an overwhelming caseload. Specifically, the four caseworker plaintiffs complain that, following the tragic discovery, in January 2008, of the deaths of Banita Jacks' four young daughters in a Washington, D.C. row house, there was a "surge in [the number of] child abuse and neglect reports." *Id*. ¶¶ 75-89 (Peters), ¶¶ 125-33 (McCall), ¶¶ 166-93 (Dyson), ¶¶ 213-28 (Washington).  While acknowledging this across-the-board increase in workload, the caseworker plaintiffs complain that they were assigned an unfair number of cases, which resulted in backlogs and prompted adverse employment actions, ranging from being "written up" to reprimands.  *Id*.  Two supervisor plaintiffs also allege retaliation: Jacqueline Moore alleges that after she complained to human resources about her treatment by a supervisor, she was retaliated against, *id*. ¶¶ 267-310, and Cynthia Courts-Marshall alleges that she was retaliated against after she refused to fire employees as instructed by her supervisor, *id*. ¶¶ 605-10, 617-18.  The allegedly retaliatory actions against these two supervisors included poor job performance evaluations, which resulted in a denial of pay increases, *id*. ¶¶ 272-81, 293 (Moore); demotion to a caseworker position to help with the post-Jacks tragedy surge in cases, *id*. ¶¶ 284-86 (Moore); and re-assignment or removal of duties, *id*. ¶¶ 308-10 (Moore), *id*. ¶¶ 630-35 (Courts-Marshall).[5]

---

[5] The three remaining supervisors (Simpson, Meade and Ekwem) do not assert retaliation claims.

All nine plaintiffs claim that they were discriminated against on the basis of race and subjected or exposed to a hostile work environment during at least some portion of their employment at CFSA between 2001 and 2009.[6]  Four plaintiffs (Ekwem, Moore, Peters and Simpson) also claim discrimination on the basis of national origin.  Six plaintiffs (Dyson, Ekwem, McCall, Moore, Peters and Washington) claim age discrimination, even though the three plaintiffs who do not make this claim are also over 40 years of age and two of them are older than some of the plaintiffs who do claim age discrimination.  Finally, six plaintiffs (Courts-Marshall, Dyson, McCall, Moore, Peters and Washington) claim retaliation.[7]

The Title VII and ADEA discrimination claims asserted by each plaintiff are summarized in the chart below.

| Plaintiff – Position | Discrimination based upon: | | | | Hostile Work Environment | Retaliation |
|---|---|---|---|---|---|---|
| | Race (Black) | National Origin | Age | Gender | | |
| Peters – Caseworker | √ | √ (Jamaican) | √ (51) | NO | √ | √ |
| McCall – Caseworker | √ | NO | NO (57) | NO | √ | √ |
| Washington-Caseworker | √ | NO | √ (52) | NO | √ | √ |
| Dyson – Caseworker | √ | NO | √ (49) | NO | √ | √ |

---

[6] Based upon statements contained in the plaintiffs' motion for leave to amend, the defendant construed the claims asserted in the Second Amended Complaint by the three new plaintiffs (Simpson, Meade and Courts-Marshall) to be limited to claims '"under the Due Process Clause of the Fifth Amendment to the U.S. Constitution due to the deprivation of equal protection rights; 42 U.S.C. § 1983; and 42 U.S.C. § 1981.' (Pl.'s Mot. Amend, p.2.)."  Def.'s Mem. in Supp. of Mot. to Dismiss ("Def.'s Mem"), ECF No. 21, at 9.  The Court disagrees with the defendant's view.  The Second Amended Complaint asserts the same Title VII claims on behalf of all the plaintiffs. Compl. ¶¶ 10-13.

[7] Only Plaintiff Ekwem asserts additional claims of gender discrimination and pendent claims for negligence, defamation and violation of the District of Columbia's Whistleblower Reinforcement Act of 1998, D.C. Law 12-160.  Compl. ¶¶ 426, 499-501.

| Meade – Supervisor | √ | NO | NO (60) | NO | √ | NO |
|---|---|---|---|---|---|---|
| Ekwem – Supervisor | √ | √ (Nigerian) | √ (52) | √ (Male) | √ | NO |
| Simpson – Supervisor | √ | √ (Jamaican) | NO (52) | NO | √ | NO |
| Moore – Supervisor | √ | √ (Trinidadian) | √ (66) | NO | √ | √ |
| Courts-Marshall – Administrator | √ | NO | NO (46) | NO | √ | √ |

The factual allegations underlying the claims of discrimination, hostile work environment and retaliatory actions vary among the plaintiffs, as described in more detail below. Detailed review of these claims, viewing the claims in the light most favorable to the plaintiffs, is necessary to assess their sufficiency and whether they "plausibly give rise to an entitlement to relief," as required by *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1941, 173 L. Ed. 2d 868 (2009).

### 1.    Allegations of CFSA-CPS Caseworker Plaintiffs Supervised by the Same Supervisor

Four of the plaintiffs served as caseworkers in CFSA's Child Protective Services and complain about the allegedly discriminatory and retaliatory conduct of the same supervisor.

**Plaintiff Angella Peters** is a 51-year old, black woman of Jamaican origin, who worked as a CPS caseworker for approximately 12 years until her resignation in October, 2009. Compl. ¶¶ 24, 25, 93. On November 9, 2009, she filed a complaint against the CFSA with the Equal Employment Opportunity Commission ("EEOC"), which issued a right-to-sue letter on March 2, 2010. *Id*. ¶ 2. Peters claims racial, national origin and age discrimination, a hostile work environment and retaliation based upon allegations that (1) a white woman supervisor

("Supervisor A"),[8] to whom Peters was assigned in 2005, "treated black caseworkers from Africa and the Caribbean Islands in a demeaning fashion," *id*. ¶ 40, apparently prompting three other employees from Jamaica and Nigeria to transfer out of the supervisor's group, *id*. ¶¶ 40-46, 48; (2) Supervisor A complained about, and punished Peters for, "alleged transgressions of other caseworkers," *id*. ¶¶ 50-51; "screamed at, talked down to, and pointed her finger at [Plaintiff] Peters," as well as yelled at her in front of others, *id*. ¶¶ 52-53, and made "intimidating comments" that the supervisor did not make to her "African American co-workers," *id*. ¶¶ 54-55; (3) Supervisor A took other actions against Peters, such as blocking her from leaving her cubicle, stopping colleagues from talking to her, and following Peters "into the bathroom and instruct[ing] her to get back to her typing as she used the bathroom stall," *id*. ¶¶ 56-58; (4) Supervisor A "bullied" white caseworkers, *id*. ¶ 37; (5) Supervisor A retaliated after Peters and her co-workers complained to the Program Manager, Supervisor B,[9] about Supervisor A's "abusive behavior" and race discrimination, prompting Supervisor B to hold a meeting in 2007 with Supervisor A and members of the unit, to discuss "racial sensitivity" and "assure[] the group that there would be no retaliation," *id*. ¶¶ 68-72; and (5) following the Jacks tragedy, Peters was "assigned an overwhelming number of cases," resulting in a case backlog for which she was given warnings, a reprimand and proposed suspension in October, 2009, while other members of Supervisor A's unit with similar backlogs were not written up, *id*. ¶¶ 75-87 (under caption "Retaliation"). Peters' complaints to two program managers, Supervisors C and D, "to

---

[8] Supervisor A is Donna Jessen. Compl. ¶ 30. Given the number of names of both plaintiffs and other CFSA employees whose conduct is described in the Second Amended Complaint, to avoid confusion, only the names of the plaintiffs are used in the text of this Opinion and non-party employees are referred to by their position and a designated letter rather than by name.

[9] Supervisor B is Felicia Cowser, about whom the Complaint provides no racial or ethnic information. Compl. ¶ 63.

end the abuse" were not addressed.  *Id*. ¶ 88.[10]  In October 2009, Peters resigned from CFSA "due to intolerable working conditions."  *Id*. ¶¶ 93-94.

   **Plaintiff Larry McCall** is a 57-year old black man, who also worked as a CPS caseworker under Supervisor A.  He filed a complaint with the EEOC against the CFSA but at the time of filing the complaint had not received a right-to-sue letter.  *Id*. ¶ 3.[11]  McCall claims racial and age discrimination, a hostile work environment and retaliation based upon allegations that (1) he was subjected to Supervisor A's intimidating comments such as "I am going to write you up," *id*. ¶ 115; (2) he "watch[ed] [Supervisor A] mistreat his foreign born co-workers," and was part of the group who complained in 2007 to Supervisor B about Supervisor A's abusive behavior and race discrimination, *id*. ¶¶ 114, 119, 121; (3) following the Jacks tragedy, he was assigned new cases resulting in a case backlog for which he was written up and "threatened . . . with the possibility of termination," even though his backlog "was similar to those of other members of [the supervisor's] unit, who had not been written up," *id*. ¶¶ 123-37 (under the caption "Retaliation"); and (4) McCall transferred out of CPS to a position with lower take-home pay because he believed he would otherwise be terminated, *id*. ¶¶ 138-41.  McCall appears to remain employed at CFSA.

   **Plaintiffs Maria Dyson** and **Katherine Washington** are 49 and 50-years old, respectively, black women, who both worked as CPS caseworkers under the same supervisor as Peters and McCall.  *Id*.  ¶¶ 147, 164, 202, 209.  They both claim racial and age discrimination, a hostile work environment and retaliation based upon allegations that (1) Dyson and Washington

---

[10] Supervisor C is James Campbell and Supervisor D is William Johnson.  Although the Complaint provides no specific race or ethnic information about either supervisor, it does indicate that "the only white supervisor in [CPS]" was Supervisor A.  Compl. ¶¶ 88, 133, 136-37, 557.

[11] The First Amended Complaint stated that McCall had received a right-to-sue letter from the EEOC on November 2, 2009.  First Am. Compl., ECF No. 5, ¶ 2.  Subsequently, plaintiffs moved for leave to amend the First Amended Complaint to correct this statement, indicating that Plaintiff McCall had not received the letter but "has requested a Right to Sue letter and expects to receive one shortly."  ECF No. 14, ¶ 3.

witnessed Supervisor A abusing foreign-born employees, including Peters; Dyson "felt abused as well," *id.* ¶¶ 154-61, 211-12; (2) following the Jacks tragedy and the surge in new cases, Dyson and Washington's backlog of cases grew, resulting in Supervisor A writing up "Ms. Washington for having a backlog," *id.* ¶¶ 171, 215, 225; (3) after Washington complained to management and filed a grievance with the union against Supervisor A, Washington was transferred to a new unit, where she was again "written up" in early January, 2010, after becoming a plaintiff in this lawsuit, *id.* ¶¶ 225-33; (4) Dyson complained to her supervisor ("Supervisor E")[12] that she was not being treated fairly after noticing that both "she and an older Indian caseworker [in her group] were being assigned a lot more cases than their three co-workers, one [of whom] was white and two [of whom] were younger." *Id.* ¶¶ 176, 185, 187; (5) in retaliation, Supervisor E wrote up Dyson for her backlog, accused her of abusing overtime and ordered an audit of her timesheets, prompting Dyson to transfer to a different group in late 2009. *Id.* ¶¶ 192-94.  Both Dyson and Washington appear to remain employed at CFSA.

### 2.   Allegations of CFSA Supervisor Plaintiffs

**Plaintiff Jacqueline Moore** is a 66-year old black woman of Trinidadian origin, who was a CFSA supervisor from 1995 until her resignation in November, 2009, except for a one-year period from February, 2008 until February, 2009, when she was detailed to work as a CPS hotline caseworker.  *Id.* ¶¶ 236, 242, 284-85, 311.  She filed a complaint with the EEOC, which issued a right-to-sue letter on March 19, 2010.  Pls.' Opp'n. to Def.'s Mot. to Dismiss ("Pls.' Mem."), ECF No. 22, at 11; Compl. ¶ 4.  Moore claims racial, age and national origin discrimination, a hostile work environment and retaliation based upon allegations that (1) from

---

[12] Supervisor E is Martha Stewart, who is white.  Compl. ¶ 165.

2000 to 2008, her black Program Administrator ("Supervisor F")[13] "singled [her] out for abusive treatment," since Moore was the "only black foreign born supervisor" and "the oldest supervisor on [Supervisor F's] staff," by "isolat[ing]" her, excluding her from meetings, becoming "hostile when Ms. Moore made a comment," never inviting her to lunch with the Program Administrator and the staff, making disparaging remarks about her in the presence of other social workers, screaming at her, and "regularly threaten[ing] to write up Ms. Moore, and on an occasion [writing] up Ms. Moore for 'borderline insubordination,'" Compl. ¶¶ 246-63; (2) from 2004 to 2008, her immediate supervisor ("Supervisor G")[14] "was openly abusive," "screamed at Ms. Moore during a meeting," and wrote in an evaluation that he gave her a poor job performance evaluation because "Ms. Moore had filed complaints against him with human resources," *id.* ¶¶ 268-69, 280; (3) following the Jacks' tragedy, Moore was the only supervisor demoted to caseworker and detailed to CPS, where she received a "very good job performance evaluation" and was "officially reinstated to the position of supervisor," *id.* ¶¶ 284-92 (under caption "Retaliation"); (4) for approximately three months in Spring 2009, when Supervisor D was her immediate supervisor, he was "abusive," "regularly shouted at Ms. Moore in the presence of her staff," and "threatened Ms. Moore with disciplinary action," *id*. ¶¶ 297-300; and (5) following an unapproved four month leave under the Family Medical Leave Act, Moore discovered that her staff and duties had been reassigned to a younger employee, who was native born, *id*. ¶¶ 308, 310.  "Feeling that she would be officially terminated, Ms. Moore submitted her resignation, effective January 1, 2010, in November 2009."  *Id*. ¶ 311.

---

[13] Supervisor F is Valerie Douglas, who is black.  Compl. ¶¶ 243, 245.

[14] Supervisor G is Willie Tompkins, about whom the Complaint provides no specific race or ethnic information.  Compl. ¶ 267.  As previously noted, *supra* note 10, the Complaint indicates that the "only white supervisor in [CPS]" was Supervisor A.  *Id.* ¶ 557.

**Plaintiff Joan Simpson** is a 52-year old black woman of Jamaican origin, who was a CPS supervisor from 2005 until 2008, when she was "terminated as a result of the Jacks tragedy." *Id.* ¶¶ 315, 32-21, 325.  Simpson claims racial and national origin discrimination and a hostile work environment based upon allegations that (1) management did not express a policy of intolerance for the use of racial/ethnic slurs when, in 2005, a Nigerian employee and an African American employee were suspended for having a physical altercation during which the African American employee called the Nigerian an "African monkey," and other employees used "racial and ethnic slurs," including complaining about working for an Asian supervisor, *id.* ¶¶ 333, 344-48; (2) she witnessed Supervisor A engage in harsh treatment of Peters and Jamaican and Nigerian caseworkers, *id.* ¶¶ 352-69; (3) Simpson and Ekwem were the "only supervisors to be regularly assigned more than five caseworkers," but her complaints to Plaintiff Courts-Marshall about the "disparity between the number of caseworkers assigned to her and Mr. Ekwen and their American born counterparts," were not remedied, *id.* ¶¶ 380, 387, 390; (4) Supervisor B refused to write a recommendation for Simpson although she did so for an Asian co-worker, *id.* ¶¶ 396-99; and (5) "[m]anagement perpetuated the myth that foreign social workers were only in it for the money" by circulating a list of overtime earners, which list "included foreign born social workers," *id.* ¶¶ 406-14.  In January, 2008, Simpson was terminated "in response to the Jacks tragedy." *Id.* ¶ 394.

**Plaintiff Augustine Ekwem** is a 52-year old black man of Nigerian origin who had worked as a CPS supervisor for five years at the time the Second Amended Complaint was filed. *Id.* ¶¶ 426, 432.  He claims racial, gender, age and national origin discrimination and a hostile work environment based upon allegations that (1) from 2004 to 2005, his white program

administrator ("Supervisor H")[15] "harassed" and "demeaned" him, *id.* ¶¶ 470, 472; (2) following the Jacks tragedy, his workload increased significantly and, as the only Nigerian and oldest supervisor in CPS, Ekwem was assigned more caseworkers "than any other supervisor" and both he and Simpson were "regularly assigned more caseworkers than their American born counterparts" as well as assigned the "problem employees." *Id.* ¶¶ 446, 452, 454-55, 467, 469, 473, 477-78; and (3) Ekwem expressed concern to the Deputy Director of Operations ("Supervisor I")[16] and his Program Manager ("Supervisor J")[17] about an overwhelmed caseworker under his supervision, but this caseworker continued to be assigned additional cases, including one in which a six month old boy died on June 25, 2008, resulting in termination of the caseworker and suspension of Ekwem for ten days, *id.* ¶¶ 437, 440, 442, 445, 457, 462-64. Ekwem appears to remain employed at CFSA.

**Plaintiff Melva Meade** is a 60-year old black woman, who has been a CFSA training supervisor assigned to CPS since 2005. *Id.* ¶¶ 507, 510-511. She claims racial discrimination and hostile work environment based upon allegations that (1) "several black social workers, particularly those from Africa and the Caribbean Islands, were mistreated by their white supervisors," including her observation of Supervisor H harassing Ekwem and other Nigerian caseworkers, *id.* ¶¶ 502-03, 530-59; (2) management circulated a list of overtime earners, which list included foreign born social workers, and would accuse people on the list of "ripping off the system" and "stealing overtime," and management employed other "aggressive tactics to [discourage] these social workers from claiming the full amount of overtime pay they had

---

[15] Supervisor H is Heather Stowe, who is white.  Compl. ¶¶ 328, 470, 528.

[16] Supervisor I is Audrey Sutton, about whom the Complaint provides no racial or ethnic information.  Compl. ¶ 442.

[17] Supervisor J is Michelle Farr, about whom the Complaint provides no racial or ethnic information.  Compl. ¶ 442.

earned," *id*. ¶¶ 520-24; and (3) "[b]lack foreign born social workers, especially Africans, were stigmatized by these accusations," *id.* ¶ 526.  Meade appears to remain employed at CFSA.

**Plaintiff Cynthia Courts-Marshall** is a 46-year old black woman, who served from 2002 to 2005 as a CFSA program manager and, in October, 2005, succeeded Supervisor H as the program administrator in charge of CPS, until her termination in January, 2008 "due to the Jacks tragedy."  *Id.* ¶¶ 565, 568-71, 641-42.  She claims racial discrimination, hostile work environment and retaliation, based upon allegations that (1) "[e]xecutive management circulated lists with the names of the top overtime earners," "accused people on the lists," which included both American and foreign born social workers, of "stealing overtime," and caused resentment of foreign born workers, particularly Africans, *id.*  ¶¶ 597-602; (2) in January, 2006, Supervisor I, the Deputy Director of Operations, directed Courts-Marshall to terminate 15 employees, including Plaintiffs Peters, McCall, Dyson and Ekwem, but Courts-Marshall refused to comply, since she "concluded that the individuals on the list were placed there for retaliatory reasons, such as complaining about [Supervisor H's] discriminatory practices," *id.* ¶¶ 605, 608-09, 617-18; and (3) Supervisor I "effectively transferred Ms. Courts-Marshall's decision making authority to [an Associate Deputy Director]," but refused to accept her offer to resign, and nevertheless subsequently terminated her "without a proper investigation," *id.*  ¶¶ 634-36, 642 (under caption "Retaliation").  In January, 2008, Courts-Marshall was terminated "due to the Jacks tragedy."  *Id.* ¶ 641.

## II.     LEGAL STANDARD

The defendant has moved to dismiss the Second Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim.  In evaluating whether a complaint sufficiently states a claim for relief to withstand a motion to dismiss under

this Rule, the court must first ascertain whether the complaint contains "a short and plain statement of the claim showing that the pleader is entitled to relief," as well as grounds for the court's jurisdiction and the specific relief sought.  FED. R. CIV. P. (8)(a).  While "detailed factual allegations" are not required, the complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and quotation marks omitted); *see also Ciralsky v. CIA*, 355 F.3d 661, 668-71 (D.C. Cir. 2004).  In assessing whether a complaint is sufficient, the "court 'constru[es] the complaint liberally in the plaintiff's favor,' 'accept[ing] as true all of the factual allegations contained in the complaint.'"  *Aktieselskabet AF 21. November 2001 v. Fame Jeans*, 525 F.3d 8, 15 (D.C. Cir. 2008) (quoting *Kassem v. Wash. Hosp. Ctr.*, 513 F. 3d 251 (D.C. Cir. 2008)); *see also Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009).

Notably, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 129 S. Ct. 1937, 1940.  Thus, the complaint must set forth more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," and "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (quoting *Twombly*, 550 U.S. at 555); *see also Aktieselskabet AF 21. November 21*, 525 F.3d at 17 n.4 (explaining that the court has "never accepted legal conclusions cast in the form of factual allegations") (internal citation and quotation marks omitted).

"To survive a motion to dismiss, the pleadings must suggest a plausible scenario that shows that the pleader is entitled to relief."  *Jones v. Horne*, 634 F.3d 588, 595 (D.C. Cir. 2011) (internal citation and quotations omitted); *see also Ivey v. Fenty*, 789 F. Supp. 2d 65, 68 (D.D.C. 2011) ("A claim is facially plausible when the pleaded factual content allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged.") (internal

citations and quotations marks omitted).  The plausibility standard for pleading demands more

than that the factual allegations present a "sheer possibility that a defendant has acted

unlawfully," and requires a "common sense," "context-specific" examination of the pleadings to

"determine whether they plausibly give rise to an entitlement to relief."  *Iqbal*, 129 S. Ct. at

1949; s*ee also Twombly*, 550 U.S. at 567-70 (antitrust complaint dismissed because allegations

of parallel conduct, even accepted as true, were consistent with an unlawful agreement but also

compatible with, and indeed more likely explained by, lawful, unchoreographed free-market

behavior and, therefore, did not plausibly suggest an unlawful agreement).  "Where a complaint

pleads facts that are merely consistent with a defendant's liability, it stops short of the line

between possibility and plausibility of entitlement to relief."  *Iqbal*, 129 S. Ct. at 1949 (citation

and internal quotation marks omitted).  Indeed, to "enter the realm of plausible liability," the

factual allegations must be more than merely "neutral" or "suggestive," and plaintiffs must

"[nudge] their claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 557

n.5, 570.

Consequently, when evaluating whether a complaint sufficiently sets forth a plausible

claim for relief under Rule 12(b)(6), the court must apply a two-pronged approach, which, first,

"identif[ies] pleadings that, because they are no more than conclusions, are not entitled to the

 assumption of truth."  *Iqbal*, 129 S. Ct. at 1950.  Second, the court must examine the factual

allegations and, assuming their veracity, "then determine whether they plausibly give rise to an

entitlement to relief."  *Id*.  Absent factual matter permitting the court "to infer 'more than the

mere possibility of misconduct,'" the complaint must be dismissed.  *Jones*, 634 F.3d at 596

(quoting *Atherton*, 567 F.3d at 681-82).[18]

Viewing the claims in the light most favorable to plaintiffs, as it must at this stage of the

proceedings, the Court proceeds with a discussion of the plaintiffs' claims as follows.  The Court

first addresses, in section III, Plaintiff Ekwem's claims, which the Court concludes are barred by

the doctrine of *res judicata*.  The Court then turns, in section IV, to the defendant's Motion to

Dismiss for the claims of the remaining eight plaintiffs.  The Court addresses (A) the dismissal

of the Title VII and ADEA claims of five of the plaintiffs for failure to exhaust their

administrative remedies.  The Court then analyzes the claims of the remaining plaintiffs, Peters,

McCall, and Moore, addressing (B) their hostile work environment claims, (C) their disparate

treatment claims, and (D) their retaliation claims.  The Court then reviews the plaintiffs' (E)

constitutional claims under 42 U.S.C. § 1983 and 42 U.S.C. § 1981, and (F) District of Columbia

Human Rights claims.  Finally, the Court considers, in section V, the plaintiffs-intervenors'

Motions to Intervene.  Since the Court concludes that all of the plaintiffs' claims are subject to

dismissal, and denies the plaintiffs-intervenors' motions to intervene, the case must be dismissed.

---

[18] In support of a more lenient standard governing motions under Rule 12(b)(6), plaintiffs cite *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), *see* Pls.' Mem. at 10, but the Supreme Court has "abrogated the *Conley* formulation in [*Twombly*, 555 U.S. 544, 562-63 (2007)]."  *Jones v. Horne*, 634 F.3d at 596 n.4; *see generally* Arthur R. Miller, *From Conley to Twombly to Iqbal: A Double Play on the Federal Rules of Civil Procedure*, 60 DUKE L. J. 1 (2010) (cited in *Jones*, 634 F.3d at 596 n.4).  Even if the Court were not precluded by Supreme Court precedent in *Iqbal* and *Twombly* from adopting a more lenient standard, the plaintiffs' claims would still be dismissed.  This is not a situation where the Court is dismissing a case because plaintiffs have not been sufficiently specific in their Complaint.  In this case, the plaintiffs have pled their claims in such detail that it is possible for the Court to determine that the plaintiffs cannot possibly prevail on their claims.  There is thus no reason to allow the plaintiffs to proceed beyond this stage of the proceedings, as no amount of elaboration of the plaintiffs' claims would allow the plaintiffs to prevail on the merits of their claims.  As the Supreme Court cautioned in *Twombly*, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court."  550 U.S. at 558 (internal citation, quotation marks and ellipsis omitted).

**III.**     **The Claims of Plaintiff Ekwem Are Barred by *Res Judicata***

The Court first turns to Plaintiff Ekwem's claims.  The defendant contends that the claims asserted by Plaintiff Augustine Ekwem should be dismissed because he is barred from asserting them under the doctrine of *res judicata.*  Indeed, Ekwem concedes that he was an individual plaintiff in a separate lawsuit previously filed in this Court arising out of his employment at CFSA.  Pls.' Mem. at 26.  His prior lawsuit was dismissed with prejudice less than two months before joining this suit, on December 10, 2009, as a plaintiff in the First Amended Complaint.  *See Ekwem v. Fenty*, 666 F. Supp. 2d 71, 81 (D.D.C. 2009) ("The Court dismisses plaintiff's federal claims because he has failed to state a claim for which relief can be granted [and] declines to exercise supplemental jurisdiction and dismisses plaintiff's state law claims without prejudice.").  For the reasons discussed below, Ekwem's claims are barred under the doctrine of claim preclusion or *res judicata.  Taylor v. Sturgell*, 553 U.S. 880, 892 (2008).

**A.**     **Legal Standard**

"The doctrine of *res judicata* prevents repetitious litigation involving the same causes of action or the same issues."  *Sheppard v. District of Columbia*, 791 F. Supp. 2d 1, 4 (D.D.C. 2011) (citing *I.A.M. Nat'l Pension Fund v. Indus. Gear Mfg. Co.*, 723 F.2d 944, 946 (D.C. Cir. 1983)).  Under claim preclusion, a subsequent lawsuit will be barred if there has been prior litigation (1) involving the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction.  *See Porter v. Shah*, 606 F.3d 809, 813 (D.C. Cir. 2010); *Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006) (citing *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 323-24 (1971); *Comm'r of Internal Revenue v. Sunnen*, 333 U.S. 591, 597 (1948)); *Herrion v. Children's Hosp. Nat'l Med. Ctr.*, 786 F. Supp. 2d 359, 368 (D.D.C. 2011).

Moreover, a "'final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or *could have been raised* in that action.'" *Drake v. FAA*, 291 F.3d 59, 66 (D.C. Cir. 2002) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)) (emphasis in original); *see also Int'l Union v. Clark*, No. 02-1484, 2006 U.S. Dist. LEXIS 64449, at *46 n.19 (D.D.C. Sept. 11, 2006) ("[I]ndividual who did properly exhaust his administrative remedies . . . is nevertheless barred from maintaining his Rehabilitation Act claim in this case because he litigated that claim to a judgment on the merits in [another] case . . . . The doctrine of *res judicata* therefore applies to [that plaintiff]'s claim and requires dismissal of his claim."). There is no question here that the third and fourth prongs have been met since Ekwem's prior lawsuit was dismissed in a final judgment on the merits by another judge from this Court. Thus, only the first and second factors for application of the *res judicata* doctrine need be addressed.

### B.    Analysis

In his dismissed complaint, Ekwem claimed, *inter alia*, that the defendants — the Mayor of the District of Columbia and CFSA — allegedly discriminated against him in violation of his right to equal protection under the Fifth Amendment, and conspired to deprive him of those rights in violation of 42 U.S.C. §§1983, 1985, 1986 and 1988. Ekwem concedes that both of his lawsuits "allege employment discrimination at the [CFSA]," but argues that the first prong required for application of *res judicata* is not met. Pls.' Mem. at 26. Specifically, he contends that his current Complaint differs from the dismissed claims in two ways: first, the instant Complaint focuses on "a hostile work environment claim under Title VII, § 1981, ADEA, and DCHRA;" and, second, the instant Complaint asserts different facts regarding the "constructive

terminations" of co-workers in November 2009 that were not in existence at the time of his prior lawsuit. *Id.*

The fact that the causes of action here are not identical to the causes of action in the prior suit, however, does not overcome application of the *res judicata* doctrine to bar Ekwen's claims. "Whether two cases implicate the same cause of action turns on whether they share the same 'nucleus of facts.'" *Apotex, Inc. v. FDA*, 393 F.3d 210, 217 (D.C. Cir. 2004) (quoting *Drake*, 291 F.3d at 66); *Page v. United States*, 729 F.2d 818, 820 (D.C. Cir. 1984). The factual allegations underpinning Ekwem's current claims mirror those in the dismissed action. In the dismissed action, for example, Ekwem alleged that he was unfairly assigned an overwhelming number of cases to supervise in 2008 and that he was improperly disciplined after the death of a child whose case had been assigned to a caseworker under Ekwen's supervision. *Ekwem*, 666 F. Supp. 2d at 74-75. He asserts the same allegations in the instant complaint, namely, that his workload increased significantly in 2008 and that by June of 2008, he had been assigned more caseworkers than any other supervisor. Compl. ¶¶ 446, 452. The instant Complaint also avers that a caseworker under Ekwem's supervision was assigned a child abuse and neglect case "which concluded on June 25, 2008 with the death of a six month old boy." *Id.* ¶ 457. According to the Second Amended Complaint, the caseworker was terminated and, on July 9, 2008, Ekwem was placed on administrative leave. *Id.* ¶¶ 462-63. Based on this conduct, he alleges that the CFSA discriminated against him on the basis of his "race (black), national origin (Nigerian), age (52), and gender (male)." *Id.* ¶ 426.

Under *res judicata*, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that *were* or *could have been raised* in that action. In this action, Ekwem reasserts claims of discrimination that have been previously decided on the

merits, and a new claim of "hostile work environment" that arises from the same factual basis and thus could have been brought in his prior lawsuit.  Despite the differences in legal theories, both actions advanced by Ekwem relate largely to the same time period and turn on allegations that Ekwem was unfairly assigned too many cases and too many caseworkers to supervise, which resulted in him being improperly suspended.  The claims he asserts here could have been brought in that action and, having skipped that opportunity, he is not allowed to assert them here.[19]

Finally, as to the last factor, the parties in the dismissed lawsuit are the same parties in this litigation.  In the prior action, Ekwem named Adrian Fenty, in his official capacity as Mayor of the District of Columbia, and the CFSA as defendants.  *See Ekwem*, 666 F. Supp. 2d at 74. The real party in interest for the Mayor and CFSA in the dismissed lawsuit was the District, which is the same defendant as in the instant action.  *See Sheppard*, 791 F. Supp. 2d at 7 n.6 ("Claims against the Mayor of the District of Columbia in his official capacity are construed as claims against the District itself.") (citing *Atchinson v. District of Columbia*, 73 F.3d 418, 424 (D.C. Cir. 1996)); *Waker v. Brown*, 754 F. Supp. 2d 62, 65 (D.D.C. 2010) (substituting the District of Columbia in place of mayor, police chief, and Department of Corrections); *Henneghan v. D.C. Pub. Schs.*, 597 F. Supp. 2d 34, 37 (D.D.C. 2009) (substituting the District of Columbia for DCPS).

In sum, Ekwem's instant claims are against the same party, the District of Columbia, involve the same core factual allegations, the same discrimination claims, and new claims that could have been raised in the prior dismissed action.  Thus, his claims are barred by *res judicata*

---

[19] The claims asserted by the movant plaintiff-intervenor Patricia Ivey are likely also barred by *res judicata* since her prior discrimination lawsuit against the defendant arising from her employment as a CPS caseworker has also been dismissed.  *See Ivey v. Fenty*, 789 F. Supp. 2d 65 (D.D.C. 2011) (plaintiff's age discrimination suit for violation of Due Process and Equal Protection Clauses of the Fifth Amendment to the U.S. Constitution, 42 U.S.C. § 1983, dismissed for failure to state a claim).  Since the parties have not briefed this issue, however, and her motion to intervene is resolved on different grounds, the Court need not address this issue.

and are therefore dismissed.

## IV.   DEFENDANT'S MOTION TO DISMISS DISCRIMINATION CLAIMS OF THE REMAINING EIGHT PLAINTIFFS

The defendant has moved, pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure, to dismiss the claims of the remaining eight plaintiffs on grounds that: first, the

plaintiffs' statutory claims under Title VII and the ADEA are barred for failure to exhaust

administrative remedies; and second, the allegations of discrimination underlying the plaintiffs'

Title VII, ADEA, 42 U.S.C. §§1981 and 1983, and DCHRA claims are insufficient either under

the McDonnell-Douglas framework or to demonstrate the requisite custom or policy of the

District of Columbia to establish municipal liability.  These arguments are addressed *seriatim*

below, assuming the truth of the plaintiffs' allegations as the Court must do at the 12(b)(6) stage

of proceedings.

### A.   Dismissal of Title VII and ADEA Claims of Five Plaintiffs For Failure to Exhaust Administrative Remedies

The defendant argues for dismissal of the Title VII and ADEA claims in the Second

Amended Complaint, except the claims asserted by Peters, as untimely due to the failure to

exhaust administrative remedies.  Def.'s Mem. at 11.  At the time of filing the Second Amended

Complaint only Peters had received a Right-to-Sue letter from the Equal Employment

Opportunity Commission ("EEOC"), even though both McCall and Moore had also filed EEOC

complaints.  Compl. ¶¶ 2-4.  Both McCall and Moore subsequently received their right-to-sue

letters on March 19 and August 26, 2010, respectively.  Pls.' Mem. at 11, 28; Pls.' EEOC Docs,

ECF No. 30-2.[20]

---

[20]  In order to insure the completeness of the record regarding the status of the plaintiffs' EEOC filings, the Court directed the plaintiffs to submit "copies of any charge filed by a plaintiff or applicant for intervention with the EEOC that is related to the allegations in the Second Amended Complaint [and] . . . . any resulting right-to-sue letter issued by the EEOC."  Minute Order (Dec. 19, 2011).  In response, the plaintiffs submitted the EEOC charges filed

The defendant does not address the impact of receipt by McCall and Moore of their EEOC right-to-sue letters after the filing of this lawsuit.  Instead, the defendant analyzes the claims of these two plaintiffs as part of the group of plaintiffs who filed no complaint with the EEOC ("non-filing plaintiffs"), and argues that the Title VII and ADEA claims of all eight of these plaintiffs should be dismissed for failure to exhaust administrative remedies before filing suit.  The plaintiffs contend that any non-filing plaintiff may rely on "vicarious exhaustion" to assert his or her discrimination claims here.  The defendant counters that "the diverse and varied nature" of the plaintiffs' claims precludes the availability of vicarious exhaustion to excuse the failure to exhaust administrative remedies.   Def.'s Reply Mem. in Supp. of Mot. to Dismiss ("Def.'s Reply"), ECF No. 23, at 1.  The Court agrees in part and disagrees in part.  Specifically, as explained below, while the Court finds that McCall and Moore have timely exhausted their administrative remedies, the non-filing plaintiffs may not "piggy-back" on the administrative exhaustion by three of the plaintiffs.

---

by Plaintiffs Peters, Moore and McCall, as well as copies of the right-to-sue letters issued by the EEOC to each of these plaintiffs.  Pls.' EEOC Docs, ECF No. 30.  The plaintiffs indicated that three unidentified proposed intervenors had filed EEOC complaints and one (Fedelia Phillips) had received a right-to-sue letter.  Id. at 1.  While a court may not consider "matters outside the pleadings" in evaluating a motion to dismiss under Rule 12(b)(6) without converting the motion to one for summary judgment under Rule 56, see FED. R. CIV. P. 12(d), documents that are referenced in, or an integral part of, the complaint are deemed not "outside the pleadings."  Mead v. Lindlaw, No. 11-1063, 2012 U.S. Dist. LEXIS 33225, at *7 (D.D.C. Mar. 13, 2012) ("In deciding a Rule 12(b)(6) motion, a court may consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by [the parties].") (internal quotations and citations omitted); Hinton v. Corr. Corp. of Am., 624 F. Supp. 2d 45, 46 (D.D.C. 2009).  In this case, the EEOC charges filed by Peters, McCall and Moore are referenced in the Complaint and therefore may be considered, along with the EEOC right-to-sue letters, without converting this motion into one for summary judgment.  See Ward v. D.C. Dep't of Youth Rehab. Servs., 768 F. Supp. 2d 117, 120 n.2 (D.D.C. 2011) (where "[t]he charge of discrimination is referred to in the complaint . . . , a reference that also necessarily incorporates in the complaint the letter of determination resulting from the charge . . . the complaint necessarily relies upon the fact of the charge and the letter in pleading that administrative proceedings were pursued before this action was begun [and] the motion need not be converted to one for summary judgment."); Hamilton v. Rhee, 770 F. Supp. 2d 241, 244 n.2 (D.D.C. 2011) (noting that EEOC charge "was incorporated by reference in the plaintiff's complaint, and the court properly considers it as part of a motion to dismiss").

### 1.      Purpose of the Exhaustion Requirement

Generally, exhaustion of administrative remedies by filing a charge of discrimination with the EEOC is required before a plaintiff may bring a civil suit under Title VII or the ADEA. *See, e.g.*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798 (1973); *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 555 n.4 (1977); *Washington v. Wash. Metro. Area Transit Auth.*, 160 F.3d 750, 752 (D.C. Cir. 1998) ("Before . . . suing under either the ADEA or Title VII, an aggrieved party must exhaust his administrative remedies . . . ."); *McKeithan v. Boarman*, 803 F. Supp. 2d 63, n.3 (D.D.C. 2011); *see also* 29 U.S.C. § 626(d)(1); 42 U.S.C. § 2000e-5(f)(1).  "The purpose of the [administrative exhaustion] doctrine is to afford the agency an opportunity to resolve the matter internally and to avoid unnecessarily burdening the courts."  *Artis v. Bernanke*, 630 F.3d 1031, 1034 (D.C. Cir. 2011) (quoting *Wilson v. Pena*, 79 F.3d 154, 165 (D.C. Cir. 1996)).  Ordinarily, as proof of such exhaustion of administrative remedies, a plaintiff would receive a right-to-sue letter from the EEOC, indicating either the EEOC's dismissal of the case or its inability to bring a civil action within 180 days of the plaintiff's EEOC charge.  42 U.S.C. § 2000e-5(f)(1); *see also Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) ("Only after the EEOC has notified the aggrieved person of its decision to dismiss or its inability to bring a civil action within the requisite time period can that person bring a civil action herself."); *Currier v. Radio Free Europe/Radio Liberty, Inc.*, 159 F.3d 1363, 1366 (D.C. Cir. 1998); *Adams v. District of Columbia*, 740 F. Supp. 2d 173, 186 (D.D.C. 2010).  Thus, receipt of a notice of right-to-sue letter is a condition precedent to the initiation of a Title VII or ADEA action in court.  *See Williams v. Wash. Metro. Area Transit Auth.*, 721 F.2d 1412, 1418 n.12 (D.C. Cir. 1983); *Bondy v. Humana, Inc.*, No. 95-456, 1996 U.S. Dist. LEXIS 10035, at *10

(D.D.C. 1996); *see also Tlush v. Mfrs. Res. Ctr.*, 315 F. Supp. 2d 650, 655 (E.D. Pa. 2002)

(receipt of right-to-sue letter from the EEOC is a condition precedent to filing a Title VII claim).

### 2.    Plaintiffs Peters, McCall and Moore's Title VII and ADEA Claims Meet Exhaustion Requirement

At the outset, the defendant does not challenge Peters' claims under Title VII or the

ADEA for failure to exhaust administrative remedies since she received her EEOC right-to-sue

letters on March 2, 2010, after the filing of the original and First Amended Complaint, on

October 28, 2009 and December 10, 2009, respectively, but before the filing of the Second

Amended Complaint on March 16, 2010.  Compl. ¶ 2; Pls.' EEOC Docs, ECF No. 30-1.  Moore

"received her Right to Sue Letter on March 19, 2010," after the filing of both the First Amended

Complaint, when Moore first joined the action as a plaintiff, and the Second Amended

Complaint.  Pls.' Mem. at 11, 28; Compl. ¶ 4; Pls.' EEOC Docs., ECF No. 30-3.  McCall

received his right-to-sue letters from the EEOC for both his Title VII and ADEA claims on

August 26, 2010, after the filing of all three complaints.  Compl. ¶ 3.  Pls.' EEOC Docs., ECF

No. 30-2.

The law is clear that "the defect of a prematurely filed lawsuit may be excused when it is

cured by the issuance of a right to sue letter while the action is pending." *Cruz-Packer v. District

of Columbia*, 539 F. Supp. 2d 181, 190 (D.D.C. 2008) (citing *Williams*, 721 F.2d at 1418 n.12).

Thus, defendant's exhaustion argument is moot as to Moore and McCall.  *See Fennell v. AARP*,

770 F. Supp. 2d 118, 126 (D.D.C. 2011) (motion to dismiss for failure to exhaust administrative

remedies denied where plaintiff received EEOC right-to-sue letter during pendency of lawsuit);

*Giardino v. District of Columbia*, 252 F.R.D. 18, 20 (D.D.C. 2008) ("Because the EEOC . . .

issued a right-to-sue letter prior to the dismissal of his federal employment claims, those claims

will not now be dismissed."); *Holmes v. PHI Serv. Co.*, 437 F. Supp. 2d 110, 123 (D.D.C. 2006)

("[T]he plaintiff's failure to exhaust her administrative remedies before bringing this action was cured when the EEOC issued its second right-to-sue letter to the plaintiff . . . encompassing her retaliatory discharge claim."); *see also Hunter v. D.C. Child & Family Servs. Agency*, 710 F. Supp. 2d 152, 157 (D.D.C. 2010) (where plaintiff failed to allege receipt of right-to-sue letter but District did not contest that plaintiff received the EEOC letter after the filing of the complaint, District's "exhaustion argument is deemed abandoned").  Accordingly, to the extent that the defendant's motion to dismiss for failure to exhaust administrative remedies is intended to reach Moore and McCall, the motion is unavailing on this ground.

### 3.     No Vicarious Exhaustion for Five Non-Filing Plaintiffs

The remaining five plaintiffs (Dyson, Washington, Meade, Simpson, and Courts-Marshall) have concededly not previously filed any complaints with the EEOC, despite the requirement that all employment discrimination claims be initially and timely filed with the EEOC prior to pursuing relief in court.  These five plaintiffs rely upon the "single-filing" exception to the normal rule to urge the Court to allow them to "piggy-back" on Peters' perfected charge and, presumably, the now perfected charges of McCall and Moore.[21]  The single-filing exception "allows non-filing parties to join the suit of another similarly situated plaintiff who did file an administrative complaint against the same defendant."  *Brooks v. Dist. Hosp. Partners, L.P.*, 606 F.3d 800, 804 (D.C. Cir. 2010) (citing *Foster v. Gueory*, 655 F.2d 1319, 1322 (D.C.

---

[21] The Court is cognizant that because failure to exhaust administrative remedies is an affirmative defense, a plaintiff does not need to plead exhaustion in a complaint. *Kim v. United States*, 632 F.3d 713, 719 (D.C. Cir. 2011); *Colbert v. Potter*, 471 F.3d 158, 165 (D.C. Cir. 2006).  This means that the defendant bears the burden of pleading and proving untimely exhaustion. *Rosier v. Holder*, No. 10-525, 2011 U.S. Dist. LEXIS 67527, at *6-7 (D.D.C. June 24, 2011) (citing *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997)).  When, however, in response to a motion to dismiss, plaintiffs, such as the ones at bar, concede that they did not exhaust their administrative remedies and proffer a legal theory to excuse that failure, the court may assess the viability of that theory on a 12(b)(6) motion. *See Uzlyan v. Solis*, 706 F. Supp. 2d 44, 53 (D.D.C. 2010) (analyzing under Rule 12(b)(6) plaintiff's claimed "basis upon which the exhaustion requirements should be waived"); *see also Thompson v. DEA*, 492 F.3d 428, 438 (D.C. Cir. 2007) ("Further, even when failure to exhaust is treated as an affirmative defense, it may be invoked in a Rule 12(b)(6) motion if the complaint somehow reveals the exhaustion defense on its face.").

Cir. 1981)); *see also Byrd v. District of Columbia*, 807 F. Supp. 2d. 37, 59 (D.D.C. 2011)

("Under specific circumstances, a court may alternatively apply the 'single filing exception' to

allow a plaintiff who failed to adhere to administrative requirements to vicariously exhaust her

filing responsibilities via another plaintiff's timely filed EEOC claim.") (quoting *Brooks*, 606

F.2d at 807).  This exception is only available to non-filing parties, however, if they possess

claims that are "so similar to those asserted by the original plaintiff that no purpose would be

served by requiring them to file independent charges."  *Id*. at 63 (internal citations and quotation

marks omitted); s*ee also Price v. Choctaw Glove & Safety Co*., 459 F.3d 595, 599 (5th Cir.

2006) (claims dismissed of plaintiff members of decertified class who had not filed

administrative charges since "[a] non-charging party cannot bring her own independent lawsuit

based upon another party's charge."); *Horton v. Jackson County Bd. of County Commr's*, 343

F.3d 897, 900-01 (7th Cir. 2003) (single filing rule not applicable to plaintiff, who was allegedly

retaliated against for supporting the discrimination suit of co-plaintiff who filed administrative

charge, since despite the connection between them, different acts were behind the firing of the

two plaintiffs).

    In *Cook v. Boorstin*, 763 F.2d 1462 (D.C. Cir. 1985), which is relied upon by plaintiffs,

*see* Pls.' Mem. at 10, the court explained that "the critical factor in determining whether an

individual Title VII plaintiff must file an [administrative] charge, or whether he may escape this

requirement by joining with another plaintiff who has filed such a charge, is the similarity of the

two plaintiffs' complaints."  *Cook*, 763 F.2d at 1466 (internal quotation marks omitted).  In

assessing the similarity of claims, the court provided a practical test, explaining that "[w]here the

two claims are so similar that it can fairly be said that no conciliatory purpose would be served

by filing separate [administrative] charges, then it would be wasteful, if not vain . . . to require

separate . . . filings." *Id.* (quoting *Foster*, 655 F. 2d at 1332) (internal quotations omitted).  The court cautioned, however, that "where the two complaints differ to the extent that there is a real possibility that one of the claims might be administratively settled while the other can be resolved only by the courts . . . each plaintiff should be required to separately file . . . [a] charge in order to effectuate the purpose of Title VII's provisions for administrative relief." *Id.* (internal emphasis omitted); *see also De Medina v. Reinhardt*, 686 F.2d 997, 1012 (D.C. Cir. 1982) (reversing district court's dismissal of intervenor's claim upon finding that "her claim was so similar to that made by [plaintiff], who had filed an EEOC charge . . . that it can fairly be said that no conciliatory purpose would be served by filing separate EEOC charges"); *Byrd*, 807 F. Supp. 2d at 63 ("The similarity of two claims is evaluated for whether the original filing performs the principal notice function of the EEOC filing requirement, thus rendering a second filing by a similarly situated plaintiff unnecessary and wasteful."); *Moore v. Chertoff*, 437 F. Supp. 2d 156, 163 (D.D.C. 2006) ("A plaintiff may invoke the doctrine of vicarious exhaustion only if one plaintiff actually has exhausted his or her claims and if the exhausted claims are so similar to the unexhausted claims . . ."); *Int'l Union v. Clark*, No. 02-1484, 2006 U.S. Dist. LEXIS 64449, at *37 (D.D.C. Sept. 11, 2006) (failure of some plaintiffs to exhaust their administrative remedies may be excused "so long [as] one of their co-plaintiffs has properly exhausted a claim that is 'so similar that it can fairly be said that no conciliatory purpose would be served by filing separate [administrative complaints]'" ).

       As noted above, the exhaustion requirement serves the dual purpose of notice to the employer of the charge and an opportunity for both the employer and the EEOC to settle the dispute.  For this reason, in cases where the single-filing doctrine has been invoked, courts have examined the original EEOC filing of the party with the perfected EEOC charge to evaluate

whether it provided sufficient notice of all charges by the plaintiffs who claim to be similarly situated and seek to "piggy-back" on that charge.  Recent cases from this jurisdiction are instructive in evaluating the similarity of claims for employment discrimination and retaliation to support application of the single-filing exception.  For example, in *Brooks v. Dist. Hosp. Partners, L.P.*, the D.C. Circuit found that the district court had improperly dismissed claims asserted by external applicants for nursing assistant positions for lack of administrative exhaustion.  606 F.3d at 807.  The court concluded those external applicants could "piggy back" on the perfected EEOC charge filed by an internal applicant since examination of that EEOC charge showed that it raised the same race discrimination claim as the external applicants, was asserted on behalf of others similarly situated, and the EEOC's investigation reviewed data related to both internal and external applicants to find a disparate impact on black candidates from the employer's use of a new three-part screening test.  *Id*.  Thus, the court held that an independent EEOC filing by the external applicants "would have been redundant: [the employer] already had received adequate notice of appellants' exact allegation and the EEOC had first crack at resolving that allegation."  *Id*.  In such circumstances, where multiple plaintiffs' claims arose from the same allegedly discriminatory practice presented to and analyzed by the EEOC, the court found that the plaintiffs had "properly invoked the single-filing exception to join the lawsuit . . . ."  *Id*.[22]

---

[22] Courts in other jurisdictions have apparently limited application of the single-filing exception to circumstances where the party with the perfected administrative charge had noted the collective or class-wide nature of the claim in the EEOC charge of discrimination.  *See Welch v. Eli Lilly & Co*., No. 06-0641, 2009 U.S. Dist. LEXIS 70389, at *10-12 (S.D. Ind. Aug. 11, 2009); *see also Price v. Choctaw Glove & Safety Co., Inc.*, 459 F.3d 595, 599 (5th Cir. 2006) (finding that a party invoking the single filing rule must establish that: the plaintiff is similarly situated to the person who filed the EEOC charge; the charge provided some notice of the collective or class-action nature of the charge; and the individual who filed the EEOC charge filed a suit that the piggybacking plaintiff may join); *Anderson v. Montgomery Ward & Co*., 852 F.2d 1008, 1016-17 (7th Cir. 1988) (finding that employees subject to same discriminatory practice were not required to file timely charges with the EEOC so long as similarly situated employees filed allegations of class-wide discrimination); *Greene v. City of Boston*, 204 F. Supp. 2d 239, 241 (D. Mass. 2002) (finding that "similarly situated plaintiffs, who have failed to file administrative charges, or who have

The district court in *Byrd v. District of Columbia* reached a different result. In that Title VII lawsuit, four plaintiff-employees alleged sexual harassment and retaliation by two male supervisors at the D.C. Department of Parks and Recreation. *Byrd*, 807 F. Supp. 2d at 45. Chief Judge Lamberth reviewed the original EEOC charge and a supporting internal report submitted to the EEOC to determine whether a plaintiff, who never filed an EEOC complaint before joining the lawsuit, was permitted to "piggy-back" on her co-plaintiffs' perfected administrative complaints. *Id.* at 63. Despite certain similarities of legal claims and "overlapping" facts between the EEOC charge and the factual allegations asserted by the plaintiff, Chief Judge Lamberth concluded that the plaintiff's complaint would require "a different factual inquiry and testimony from different witnesses," and therefore would not put the defendant on notice of the extent of the plaintiff's allegations or potential hostile work environment and retaliation claims. *Id.* at 64. As a consequence, the court dismissed that plaintiff's Title VII claims for failure to comply with the administrative requirements. *Id.*

The Court finds that the legal and factual issues at stake in the instant matter are more akin to those in *Byrd,* where the court determined vicarious exhaustion was unavailable, than in *Brooks.* The Second Amended Complaint summarily mentions that Peters, McCall and Moore filed charges with the EEOC, without any description of the precise factual allegations presented to that agency. No party to the instant action provided the Court with a copy or details regarding the contents of these perfected EEOC charges in order to assess the sufficiency of notice about the discrimination allegations, until the Court so directed. In its briefing, the defendant relies solely on a comparison of factual allegations and legal claims asserted by the plaintiffs in the Second Amended Complaint to show that they are so "diverse and varied" and "wide-ranging"

---

filed untimely charges, are permitted to piggyback on a timely-filed charge that gives the EEOC and the employer fair notice of allegations of class-wide discrimination.").

that "separate administrative adjudication was not only possible, but necessary." Def.'s Reply at 3. In the defendant's view, the five non-filing plaintiffs (Dyson, Washington, Simpson, Meade and Courts-Marshall) [23] may not piggyback on the administratively exhausted claims because these plaintiffs allege different bases for discrimination and different kinds of mistreatment by different supervisors. Def.'s Mem. at 11-12; Def.'s Reply at 3-4. The Court agrees.

The legal claims of the five non-filing plaintiffs are not identical to those asserted by McCall, Moore, and Peters in the Second Amended Complaint or in their perfected EEOC charges. In the Second Amended Complaint, the three filing plaintiffs each assert claims of race discrimination, hostile work environment and retaliation, and both Moore and Peters also assert claims of age and non-American born national origin discrimination, all of which were stated in their respective EEOC charges. While each of the non-filing plaintiffs assert legal claims of race discrimination and hostile work environment within CPS during all or part of the same time period from 2005 to 2009, only one (Simpson) claims national origin discrimination, two (Washington and Dyson) claim age discrimination and four (claim retaliation). Thus, the non-filing plaintiffs provide different combinations of protected status for their discrimination claims than those included in the perfected EEOC charges of Peters, McCall, and Moore.

The differences in their legal claims undercut each other. Peters and Moore's EEOC charges assert age and national origin discrimination based upon the alleged assignment of more work and the alleged harsher scrutiny given to older, non-American born black caseworkers and supervisors. More precisely, Peters states in her EEOC charge that black caseworkers and supervisors, who are "age 40 and over, and non-American born are systematically assigned more work and subjected to harsher scrutiny than others who are not in these categories." Pls.' EEOC

---

[23] The claims of Plaintiff Ekwem are barred by the doctrine of *res judicata*, *see supra*, and therefore are not discussed in this section of the opinion.

Docs., No. 30-1, at 1.  Moore indicates in her EEOC charge that she has "been subjected to differential treatment as compared to my non-Trinidadian co-workers," including that after a leave, she "discover[ed] that a younger, Black American had been hired to fill [her] position." Pls. EEOC Docs., ECF No. 30-3, at 1.  Yet, despite their EEOC charges of age discrimination, which are repeated in the Second Amended Complaint, three of the non-filing plaintiffs (Meade, Simpson, and Courts-Marshall) are 40 or older but do not allege any age discrimination. Furthermore, despite the EEOC charges by Peters and Moore of national origin discrimination against non-American born black employees, McCall and four of the non-filing plaintiffs (Dyson, Washington, Meade, Courts-Marshall) do not fit into the category of "non-American born" and still claim that they, too, were discriminated against because they were black.[24]

The differences in the factual allegations pertaining to each plaintiff's claims also undercut each other.  For example, notably, Moore was one of four supervisors detailed to CPS to assist with the surge in cases after the Jacks tragedy, and despite her "humiliat[ion] by her demotion to hotline caseworker," she "received compliments on her work and a very good job performance evaluation," after which she was "officially reinstated to the position of supervisor and given a staff."  Compl. ¶¶ 285-92.  Moore's positive experience is difficult to square with the allegations of race, age and national origin discrimination directed at CPS caseworkers alleged by her co-plaintiffs.  The Second Amended Complaint further undermines this core racial and national origin discrimination claim with inconsistent allegations that employees who were not black also suffered discriminatory actions.  *See, e.g.*, *id.* ¶¶ 176-88 (Dyson) (Indian co-worker also assigned more cases than "white," "younger" co-workers); *id.* ¶ 37 (Peters) (Supervisor A

---

[24] While Moore's EEOC charge identifies the younger employee who assumed Moore's position as "Black American," the Second Amended Complaint identifies that employee as "newly hired," "younger" and "native born," omitting the fact that the employee was also black.  Compl. ¶ 308.

"bullied" white caseworkers).  As the defendant observes, "the individual plaintiffs' allegations are so varied that they even contradict themselves."  Def.'s Reply Mem. at 3.

Although the non-filing plaintiffs' legal claims overlap with those of the perfected EEOC charges, this is not enough to excuse the bypassing of the administrative process for these five plaintiffs when the underlying factual allegations for each of their claims differ significantly. The single-filing doctrine is limited to cases in which the legal claims are identical and arise from the same facts, not merely from overlapping or similar facts that may be linked to each other because the facts involve employees of the same agency.  Indeed, just because the plaintiffs claim to have suffered a violation of one or more of the same provisions of law as contained in the perfected EEOC charges does not mean that their claims depend upon a shared set of facts or a common injury that would have provided notice of the individual claims.  Unlike *Brooks*, where not only the legal claims were identical but also the factual allegations supporting those claims stemmed from the employer's use of the same challenged hiring practice, Peters, McCall and Moore's perfected administrative charges each allege distinct factual events that not only differ among themselves but also from those of the five non-filing plaintiffs.

Among the myriad ways in which the allegations asserted by the non-filing plaintiffs in the Second Amended Complaint differ from the facts set forth in the EEOC charges filed by McCall, Moore and Peters are that different management personnel were responsible for the discriminatory conduct at issue.  The EEOC charges of both Peters and McCall cite allegedly unfair conduct only by Supervisor A and Moore cites such conduct only by Supervisor F.  In the Second Amended Complaint, Moore also describes allegedly abusive conduct by Supervisors D and G.  The non-filing plaintiffs complain about entirely different supervisors.  Non-filing plaintiffs Dyson, Simpson, Meade and Courts-Marshall complain about conduct by Supervisors

B, E, H and I, who are nowhere complained about by Peters, McCall or Moore either in the Complaint or in the perfected EEOC charges.

In addition, the alleged misconduct engaged in by Supervisors A through I towards the non-filing plaintiffs varies significantly from the specific conduct alleged in the perfected EEOC charges.  McCall's EEOC charge refers to a single instance of Supervisor A giving him a critical written performance warning in July, 2009, while Peters' EEOC charge states that the same Supervisor A "singled [her] out" and "on at least four occasions" made formal write-ups about Peters' performance, even though similarly situated employees, who were younger and white, were not written-up.  Pls.' EEOC Docs., at ECF Nos. 30-1, 30-2.  In the Second Amended Complaint, Peters provides additional detail that Supervisor A made abusive and demeaning comments and engaged in bullying conduct directed at her.  The other three CPS caseworkers (McCall, Dyson and Washington) allegedly witnessed aspects of Supervisor A's mistreatment of Peters, but nowhere allege that this abusive conduct was directed at them.  Indeed, even though Dyson was supervised by Supervisor A, she claims that a different supervisor, Supervisor E, imposed performance penalties on her due to her backlog of cases following the Jacks tragedy. Compl. ¶¶ 190-92.

As noted above, in her EEOC charge, Moore cites her black Supervisor F for excluding Moore from meetings and assigning her "a greater work load and . . . menial task[s]."  Pls.' EEOC Docs., ECF No. 30-3.

By contrast to the conduct of Supervisors A and F cited in the perfected EEOC charges, the allegedly discriminatory conduct engaged in by the other supervisors set forth in the Second Amended Complaint covers a broad range of activity.  For example, certain supervisors are accused of ineffectually addressing employee complaints about Supervisor A's conduct

(Supervisors B, C, D), refusing to write a recommendation (Supervisor B), or directing a subordinate to terminate employees purportedly for retaliatory reasons (Supervisor I).  These differences are significant.  Confronted with the charges of the three filing plaintiffs, the EEOC would not have been alerted to the scope of the allegations asserted now by the non-filing plaintiffs against a far greater number of supervisors in the Second Amended Complaint.

Finally, the claimed adverse employment consequences of the defendant's allegedly discriminatory conduct varies between the filing and the non-filing plaintiffs.  For example, both Peters and Moore claim that their resignations were constructive discharges, and McCall claims that his job transfer was a constructive transfer.  *See* Peters EEOC Charge, ECF No. 30-1 ("I resigned because the conditions were unbearable."); Moore EEOC Charge, ECF No. 30-3 ("I am on leave pending my retirement. . . ."); McCall EEOC Charge, ECF No. 30-2 ("I transferred out of the Ms. Jessen's unit" and, according to the Compl. ¶ 138, out of the CPS).  By contrast, the non-filing plaintiffs claim injuries ranging from poor performance write-ups and transfers within CPS to termination.  *See, e.g.*, Compl. ¶ 194 (Dyson transferred to another unit within CPS); ¶ 233 (Washington written-up); ¶ 394 (Simpson terminated); ¶ 561 (Meade feared retaliation but alleges no adverse employment action); ¶ 641 (Courts-Marshall terminated).

In sum, the allegations of the non-filing plaintiffs are not "so similar" that "no conciliatory purpose would be served by filing separate EEOC charges. . . ."  *Foster*, 655 F.2d at 1322.  Consequently, the administrative complaints filed by McCall, Moore and Peters would not suffice to provide notice to the EEOC or the possibility of the disposition of claims by the non-filing plaintiffs, who seek to "piggy-back" on their co-plaintiffs' perfected EEOC charges.  Therefore, the doctrine of "vicarious exhaustion" does not apply and each plaintiff is required to exhaust his or her individual administrative remedies.  Only Peters, Moore and McCall satisfy

the exhaustion requirement.  Accordingly, the Title VII claims of the non-filing plaintiffs Dyson, Washington, Meade, Simpson, and Courts-Marshall, as well as the ADEA claims[25] of plaintiffs Dyson and Washington, will be dismissed for failure to exhaust administrative remedies.

### B.    Hostile Work Environment Claims of Plaintiffs Peters, McCall and Moore

Plaintiffs Peters, McCall and Moore contend that they have "actionable hostile work environment claims based on race, age and/or national origin discrimination."  Pls.' Mem. at 11. Viewing the allegations in the light most favorable to the plaintiffs, the Second Amended Complaint alleges, generally, that CFSA "[m]anagement condoned a hostile work environment and took no measures to prevent it."  Compl. at 2.  In particular, both Peters and McCall allege in support of their claims, that they "worked in a racially hostile work environment, from 2005 to 2009, where [older], black caseworkers, particularly those from Africa and the Caribbean Islands, were bullied by their supervisors."  *Id*. ¶¶ 22, 97.  Moore alleges that she, too, "worked in a hostile work environment, from 2001 to the present, where she was bullied by her supervisors."  *Id*.  ¶ 237.  The defendant contends that these plaintiffs have failed to establish a *prima facie* claim of a hostile work environment since, even if they were mistreated by their supervisors, they cannot show it was because of their protected status.[26]  Def.'s Mem. at 15-16. The Court agrees that these plaintiffs have failed to plead a *prima facie* case of hostile work environment.

---

[25] Plaintiffs Meade, Simpson and Courts-Marshall did not assert age discrimination claims under the ADEA.

[26] The defendant summarily asserts without analysis that "many of the allegations" underlying the plaintiffs' Title VII claims are time-barred, stating that Title VII claims require the filing of "a charge of discrimination with the [EEOC] either 180 days or 300 days after the alleged unlawful employment practice occurred.  42 U.S.C. §2000e-5(e)(1)."  Def.'s Mem. at 22-23.  For purposes of a hostile work environment claim, however, the law permits consideration of activity falling outside the limitation period so long as the acts underlying the claim occur within the period.  *See Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011) ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.") (quoting *Singletary v. District of Columbia*, 351 F.3d 519, 526-27 (D.C. Cir. 2003) and *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)).

1.        **Legal Standard**

A plaintiff may establish a violation of Title VII by proving that the employer created or condoned a discriminatorily hostile or abusive environment.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64-65 (1986).  Discrimination in this form occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation and quotation marks omitted); *Singletary*, 351 F.3d at 526.  The Supreme Court in *Harris* explained that assessing whether a hostile work environment exists has both subjective and objective components.  Thus, no Title VII violation is present "if the victim does not subjectively perceive the environment to be abusive" and the conduct "is not severe or pervasive enough to create an objectively hostile or abusive work environment."  *Harris*, 510 U.S. at 21-22.

While the subjective test of whether the plaintiff actually found the environment abusive may be readily satisfied in employment discrimination suits, the Supreme Court has acknowledged that the boundaries of what constitutes an objectively discriminatorily hostile work environment is not "a mathematically precise test."  *Id*. at 22.  The "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances."  *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998) (internal quotations and citations omitted).  This objective test requires examination of the totality of the circumstances, including "the frequency of the discriminatory [or retaliatory] conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

The Supreme Court has been clear that Title VII does not establish a "general civility code for the American workplace." *Oncale*, 523 U.S. at 80. Indeed, "Title VII does not prohibit all verbal or physical harassment in the workplace." *Id.* "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to" a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citations omitted); *see also EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008) (complaints that would objectively give rise to bruised or wounded feelings or incidents that are premised on nothing more than rude treatment, callous behavior, or a routine difference of opinion and personality conflict will not satisfy the severe or pervasive standard).

To "[prevent] Title VII from expanding into a general civility code," the Supreme Court has emphasized as "crucial" the requirement that the behavior be "so objectively offensive as to alter the conditions of the victim's employment." *Oncale*, 523 U.S. at 81; *see also Faragher*, 524 U.S. at 788 ("Conduct must be extreme to amount to a change in the terms and conditions of employment . . . ."). Bosses may be harsh, unfair and rude, but conduct so characterized does not necessarily rise to the level of a Title VII violation.

In addition, the plaintiff "must always prove that the conduct at issue was not merely tinged with offensive . . . connotations, but actually constituted discrimination . . . because of" the employee's protected status. *Oncale*, 523 U.S. at 81 (quotation marks and emphasis omitted). In other words, plaintiffs are required to establish a causal connection between the harassment and their protected activity to succeed on the claim. *See Nichols v. Truscott*, 424 F. Supp. 2d 124, 140-41 (D.D.C. 2006). "It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of

personnel appeals." *Lewis v. District of Columbia*, No. 07-0429, 2010 U.S. Dist. LEXIS 93299, at *38-39 (D.D.C. Sept. 8, 2010) (citing *Bryant v. Brownlee*, 265 F. Supp. 2d 52, 63 (D.D.C. 2003)).

Taken together, the Supreme Court's guidance about the requisite elements for a hostile work environment claim has been enumerated as follows: the plaintiff must show that (1) he or she is a member of a protected class; (2) he or she was subjected to unwelcome harassment; (3) the harassment occurred because of the plaintiff's protected status; (4) the harassment was severe to a degree which affected a term, condition, or privilege of employment; and (5) the employer knew or should have known about the harassment, but nonetheless failed to take steps to prevent it. *Turner v. Shinseki*, No. 07-0643, 2011 U.S. Dist. LEXIS 131426, at *59-60 (D.D.C. Nov. 15, 2011); *Dorns v. Geithner*, 692 F. Supp. 2d 119, 135-36 (D.D.C. 2010) (citing *Hendricks v. Paulson*, 520 F. Supp. 2d 65, 89 (D.D.C. 2007)); *Roberson v Snow*, 404 F. Supp. 2d 79, 89-90 (D.D.C. 2005).

Set against these requirements, and assuming the "veracity" of the plaintiffs' claims, plaintiffs Peters, McCall and Moore have "failed to alleged facts that 'plausibly give rise to an entitlement to relief'" for their hostile work environment claims. *Ivey*, 789 F. Supp. 2d at 72 (quoting *Iqbal*, 129 S. Ct. at 1949-50).

## 2. Analysis

In this case, there is no dispute that plaintiffs Peters, McCall and Moore, who each are black and over 40 years of age, are members of a protected class and that they each allege that they personally felt the CFSA-CPS environment was hostile. Indeed, as to Peters and McCall at least, the defendant concedes that, "[i]f taken as true, these allegations may establish that

[Supervisor A] was rude and intimidating . . . ."  Def.'s Mem. at 14.  Thus, the Court finds that the first two elements of a hostile work environment claim are met.

Nevertheless, the defendant contends that the plaintiffs fail to show that any alleged mistreatment was because of their membership in a protected class.  *Id*. at 14-18.  In determining whether a hostile work environment exists, the court must look at the "totality of the circumstances," including whether the comments or actions at issue "expressly focused" on the plaintiff's protected class.  *McKeithan*, 803 F. Supp. 2d at 69 (quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008)).  According to the defendant, "no plaintiff in this action alleges facts showing that he or she was the direct target of a single discriminatory remark or action, much less a working environment heavily polluted with discrimination."  Def.'s. Reply at 5 (internal citation and quotation marks omitted).  Indeed, the plaintiffs acknowledge that "the harassment, with a few exceptions, was primarily harsh treatment as opposed to racial or ethnic comments."  Pls.' Mem. at 16.  Moreover, the defendant argues that merely witnessing abusive conduct, when the conduct at issue does not contain "any sort of racial, ethnic or age-related overtones," Def.'s Reply at 4, is not enough to establish a valid claim for hostile work environment.  The hostile work environment claims of plaintiffs Peters, McCall and Moore are addressed individually below.

### a.    Plaintiff Peters

Peters provides the most detail about patently unpleasant conduct by Supervisor A that was directed at Peters and that she claims contributed to the hostile work environment at CFSA-CPS.  Supervisor A allegedly over a period of about four years, "harassed" Peters, treated her "like a 'whipping boy,'" "screamed at, talked down to, and pointed her finger [and] . . . yelled at Ms. Peters," "made intimidating comments" about getting her fired or threatening to "write [her]

up," physically blocked Peters on several occasions from leaving her cubicle with the placement

of a chair and instructed her to get back to work when Peters was in the bathroom, and

interrupted Peters' conversations to stop others from talking to her.  Compl. ¶¶ 36-73.  Indeed,

Peters is identified as the employee who was "the principal target of [Supervisor A's] abuse."

Compl. ¶¶ 48, 223; *see also id.* ¶ 108 ("Ms. Peters received the worst treatment."); *id.* ¶ 158

("Ms. Peters received the most degrading treatment of anyone."); *id.* ¶ 354 ("[Supervisor A]

singled Ms. Peters out for harsh treatment.").  The defendant argues that these actions directed at

Peters do not contain discriminatory content and therefore "fail to show that [Supervisor A]

mistreated Ms. Peters <u>because of</u> her protected status."  Def.'s Mem. at 15 (emphasis in

original).  Indeed, even rude office conduct that generates stressful working conditions does not

create liability for discrimination under Title VII, unless that conduct is "permeated with

discriminatory intimidation, ridicule, and insult."  *Harris*, 510 U.S. at 21 (internal quotations

omitted).

    In an effort to satisfy the requirement of showing an environment hostile to persons due

to their race, national origin or age — as opposed to generally unpleasant for all the employees

and particularly unpleasant for Peters — the plaintiffs allege that "older, black caseworkers,

particularly those from Africa and the Caribbean Islands, were bullied by their supervisors

[while] [s]imilarly situated caseworkers, who were younger or not black, were not bullied by

their supervisors."  Compl. ¶¶ 22-23, 97-98, 145-46.  Yet, this assertion is undermined by the

allegations that (1) white caseworkers managed by Supervisor A "were bullied like their black

counterparts," *id.* ¶ 37; (2) Supervisor A "complain[ed] about other caseworkers," *id.* ¶ 50,

apparently without distinction as to their protected status; (3) Supervisor A "did not make

[intimidating ] comments to . . . Ms. Peters' African American co-workers," *id.* ¶ 55; and (4)

Supervisor A's unit, which the complaint alleges includes <u>both</u> white and black caseworkers, complained about this supervisor's "abusive behavior" and accused her of race discrimination, *id.* ¶¶ 37, 68-69; 119.   As the defendant states, "plaintiffs' allegations clearly indicate that [Supervisor A] mistreated <u>everyone</u>, regardless of their race."  Def.'s Mem. at 15.

Not only do the internally inconsistent factual allegations in the Complaint defeat the third requisite element of showing that Peters was subjected to abuse because of her protected status, but she has failed to establish the fourth requisite element for a hostile work environment claim.  Specifically, during the several years that Peters worked for Supervisor A from 2005 until early 2008, there is no allegation that she was penalized by any material adverse change in the terms or conditions of her employment.  Over the course of those four years, she does not allege that she was given any "write-up," any reprimand, any suspension, or any forced transfer.  In fact, the only adverse personnel actions cited by Peters — warnings and a reprimand allegedly culminating in her alleged constructive discharge in October, 2009 — occurred after the 2008 Jacks tragedy and are part of the factual allegations underlying Peters' claim of retaliation.  *See* Compl. ¶¶ 74-89 (captioned "Retaliation"); *see also Hampton v. Vilsack*, 760 F. Supp. 2d 38, 56-57 (D.D.C. 2011) ("Plaintiff cannot, however, rely on the discrete acts upon which he bases his discrimination and retaliation claims to support a hostile environment claim.") (citing *Franklin v. Potter*, 600 F. Supp. 2d 38, 76 (D.D.C. 2009) ("Because plaintiff's allegedly hostile events are the very employment actions he claims are retaliatory, he cannot so easily bootstrap alleged retaliatory incidents into a broader hostile work environment claim.") (internal quotation marks and citations omitted)); *Wade v. District of Columbia*, 780 F. Supp. 2d 1, 19 (D.D.C. 2011) (rejecting plaintiff's effort to transform amalgamation of disparate treatment claims into cause of action for hostile work environment for lack of connection in pervasive pattern of severe

harassment) (citing *Lester v. Natsios*, 290 F. Supp. 2d 11, 33 (D.D.C. 2003) ("Discrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult.")).

Even if Peters' allegations of adverse personnel actions in 2008 and 2009 are considered in support of her claim of a hostile work environment as well as her retaliation claim, they must be considered in the context of other allegations in the Complaint.  Peters' claims about her treatment following the Jacks tragedy generally boil down to the allegation that she was assigned an overwhelming number of cases, which created a backlog for which she was penalized by being "written up" multiple times, when "other members of [Supervisor A's] unit" with similar backlogs "were not written up."  Compl. ¶ 85.  She alleges more specifically that "by March 31, 2008" she "had 41 cases to investigate with a backlog of 31 cases," and was being written up for the backlog the following month.  *Id.* ¶¶ 79, 83.  She had more of a backlog than McCall and Dyson but less of a backlog than Washington, but they too were written up.  *Id.* ¶¶ 127, 131 (as of March 31, 2008, McCall had 36 cases to investigate with a backlog of 28 cases); *id.* ¶ 168 (as of March 31, 2008, Dyson had 38 cases to investigate with a backlog of 28 cases); *id.* ¶ 215 (as of March 31, 2008, Washington had 42 cases to investigate with a backlog of 33 cases); *see also* ¶¶ 438, 445 (caseworker supervised by Ekwem had, in March, 2008, "40 cases assigned her," which increased thereafter to "57 cases").  Thus, from the face of the Complaint at least, it seems that, contrary to Peters' claim, other caseworkers in her unit with similar backlogs were, in fact, also written up, including American-born caseworkers (McCall, Dyson and Washington) and caseworkers older than Peters who do not claim age discrimination (McCall).

Moreover, other allegations make clear that the increased assignment of cases was not just to black caseworkers. An Indian caseworker was also assigned a large number of cases, *id.* ¶¶ 176-85, and of fourteen caseworkers with 40 or more cases, eleven were older than 40 years of age and five of those older workers were foreign born caseworkers from Africa, the Caribbean Islands and India. *Id.* ¶¶ 183-84. This suggests that the majority of caseworkers assigned a large caseload were not foreign-born and that the increase in reports of child abuse and neglect increased the workload across the board. In addition, it suggests that older caseworkers, no matter their race or ethnicity, were assigned and expected to deal with an increased load, presumably because they were more experienced.

Another judge on this Court has reached a similar conclusion in dismissing equal protection claims of hostile work environment and intentional discrimination of Patricia Ivey, a proposed plaintiff-intervenor in this action. *See Ivey*, 789 F. Supp. 2d at 65 (Jackson, J.). In that case, the plaintiff alleged that the defendant "created a hostile work environment for older caseworkers . . . by assigning them an overwhelming number of cases and then threatening them with disciplinary action if they did not eliminate their backlog," while "younger caseworkers were not assigned as many cases . . . ." *Id.* at 70. Judge Jackson found the allegations insufficient to meet the plausibility threshold in *Iqbal* in view of the common sense questions about how much smaller the caseloads of younger workers were compared to those of the older employees and "what was the level of experience of the younger workers?" *Id.* at 70. She also scrutinized the plausibility of the plaintiff's allegation that the assignment of a large caseload was motivated by some discriminatory animus and concluded that "there are multiple other inferences that can be drawn from these allegations." *Id.* at 71. Judge Jackson observed, "[f]or example, at a time when the Agency was under intense public scrutiny, one reasonable

interpretation of the allegations is that more cases were assigned to older caseworkers because of their superior experience and knowledge of child protective services." *Id.*

The instant allegations make apparent that the CFSA-CPS work environment was stressful and that this stress increased in 2008 after the Jacks tragedy, with supervisors pressing to ensure satisfactory job performance by caseworkers.  Indeed, in the wake of the deaths of the four Jacks children, increased scrutiny within the agency on job performance would be a common sense response to such a tragic wake-up call.  Even a highly stressful work environment is not the same as a hostile work environment imbued with the requisite pervasive discriminatory animus to support a Title VII claim.  While Peters complains that she was penalized for her job performance, this simply does not constitute an adverse employment action *because of* her protected status, when she concedes in the Complaint that she "could not eliminate her backlog no matter how many hours she worked," Compl. ¶ 84, and other allegations make apparent that others were similarly over-loaded with cases and penalized for their backlogs.  *See Reshard v. LaHood*, No. 87-2794, 2010 U.S. Dist. LEXIS 34426, at *17 (D.D.C. Apr. 7, 2010) (letter of reprimand for employee's failure to perform assigned duties not materially adverse, even though it would be placed in employee's personnel file for up to three years).

For these reasons, Peters has failed to satisfy the requirements for a *prima facie* case of hostile work environment by showing that she was subjected to hostility because of her protected status or that pervasive hostility adversely affected the conditions of her employment amounting to an adverse employment action.  Accordingly, she has failed to state a claim of hostile work environment.

b.      **Plaintiff McCall**

Plaintiff McCall corroborates the treatment by Supervisor A of Peters, alleging that "Ms. Peters received the worst treatment."  Compl. ¶ 108; *see also id*. ¶ 158 ("Peters received the most degrading treatment of anyone.") (Dyson); *id*. ¶ 223 ("Peters was the principal target of [Supervisor A's] abuse.") (Washington); *id*. ¶ 354 ("[Supervisor A] singled Ms. Peters out for harsh treatment.") (Simpson).  Yet, these allegations that Supervisor A targeted Peters more than other similarly situated caseworkers actually *undermines* the plaintiffs' assertion that Supervisor A's conduct towards them was uniformly animated by their protected status rather than some personal animosity towards Peters.  When focusing on Supervisor A's conduct towards him, McCall alleges only that this supervisor "constantly tried to intimidate him with comments like, 'I am going to write you up.'"  *Id*. ¶ 115.  This allegation of threatened personnel action falls short of alleging that the threat was *because* of his protected status and, in any event, simply does not amount to such extreme discriminatory intimidation or ridicule to alter the conditions of his employment.  *Franklin*, 600 F. Supp. 2d at 77 (the fact that supervisor "threatened" plaintiff with job-related consequences for his refusals to meet workplace expectations does not demonstrate a hostile work environment pervaded by discrimination or retaliation); *Singh v. U.S. House of Reps., Comm. on Ways & Means*, 300 F. Supp. 2d 48, 56 (D.D.C. 2004) ("Criticisms of a subordinate's work and expressions of disapproval (even loud expressions of disapproval) are the kinds of normal strains that can occur in any office setting. . . ."); *see also Baloch*, 550 F.3d at 1201 (finding that "totality of circumstances" did not show hostile work environment despite plaintiff's "several verbal clashes with his supervisor in the workplace").  Thus, McCall fails to establish the third and fourth requisite elements for a *prima facie* case of hostile work environment.

c.     **Plaintiff Moore**

Plaintiff Moore alleges in support of her claim of hostile work environment that for eight years, from 2000 to 2008, Supervisor F, who is black, singled her out for abusive treatment, including making "disparaging remarks," such as "I did not pick you" and "You would not have been my choice;" excluding her from meetings and staff lunches; screaming at her; and threatening to write her up for "borderline insubordination."  Compl. ¶¶ 247-63.  Moore does not indicate how frequently such remarks were made.  While the Court certainly does not condone the expression of disparaging or unfair remarks by a supervisor to an employee, Moore's continued performance of her supervisory duties over an eight year period, with positive evaluations for her performance during her detail and from caseworkers whom she supervised, *see*, *e.g.*, Compl. ¶¶ 196, 232, tends to undercut her contention that this was a hostile work environment.  *See Sewell v. Chao*, 532 F. Supp. 2d 126, 142 (D.D.C. 2008) ("[s]tray remarks made occasionally over an approximately eight-year period" including raised voices by supervisor, do not make workplace hostile), *aff'd  per curiam*, *Sewell v. Hugler*, No. 08-5079, 2009 U.S. App. LEXIS 4136, at *2-4 (D.C. Cir. Feb. 25, 2009).

 Moore seeks to satisfy the third element for a *prima facie* case of hostile work environment that she was mistreated because of her race, age or national origin with the bare allegations that she was "the only black foreign born supervisor" and the "oldest supervisor" under Supervisor F.  Compl. ¶¶ 247, 249.  She alleges that she was "excluded from many meetings," yet also complains about Supervisor F's conduct towards her when she "did attend meetings."  *Id*. ¶¶ 255-56.  After one incident, apparently in 2001, when Supervisor F "began screaming at her," Moore complained to human resources and received an apology from the supervisor.  *Id*. ¶¶ 257-59.  These are clearly upsetting work incidents but such travails without

any other indication that they were due to her protected status, is not enough to show a hostile work environment.  Moore also complains about her detail as a "hotline caseworker" following the Jacks tragedy.  She alleges, however, that she was not the only supervisor "detailed" to assist with the surge of child abuse and neglect reports occurring after the Jacks tragedy, although she claims to be the only supervisor placed in a "hotline caseworker" position.  *Id.* ¶ 285.  While detailed as a hotline caseworker, she "received compliments on her work and a very good job performance evaluation," and following the detail, she was reinstated to a supervisory position with a staff.  *Id.* ¶¶ 285, 291, 292.  Positive feed-back and evaluations, as well as restoration to a full management position, are inconsistent with a claim that she was discriminated against in a hostile work environment.  Thus, without more, her bare allegations about her protected status are insufficient to show that the treatment Moore received from Supervisor F was *because of* her age, national origin or race.

In addition, in the portion of the Complaint relating to her "Hostile Work Environment" claim, Moore does not claim that the harassment was severe to a degree which affected a term, condition, or privilege of employment to satisfy the fourth element for this claim.  Indeed, co-plaintiffs give positive reviews of Moore's work performance.  Compl. ¶ 196 ("Dyson considered Ms. Moore to be one of the best supervisors at the agency."); ¶ 232 ("Washington enjoyed working under Ms. Moore.").  Moreover, while Moore claims that she "feared that her job was in jeopardy," *id.* ¶ 265, such concern, without more, simply does not constitute an adverse employment action.  *See Herbert v. Architect of the Capitol*, 766 F. Supp. 2d 59, 76 (D.D.C. 2011) (proposed reprimand that "'put [plaintiff] in fear' that it would 'jeopardize his promotion'" is not a materially adverse action) (citation omitted).

The Complaint does not make clear whether the factual allegations underlying Moore's "Retaliation" claim are also proffered in support of the hostile work environment claim, a confusion that applies equally to the claims for discrete discriminatory acts, as discussed below. Under the caption of "Retaliation," Moore alleges a series of actions by three different supervisors stretching over the period from 2005, after she complained to a counselor from the Employee Assistance Program and to human resources, until her alleged constructive discharge in November, 2009.  These retaliation allegations claim (1) "openly abusive" conduct towards her by Supervisor G, including poor job performance evaluations from Supervisors F and G in 2005, 2006, and 2007, which resulted in making her ineligible for a pay increase; (2) "harsh treatment" by Supervisor D in the spring of 2009 that consisted of "regularly shout[ing]" at Moore and "on at least two occasions threaten[ing] Ms. Moore with disciplinary action;" (3) her "detail" as a hotline caseworker in CPS to assist with the post-Jacks surge in child abuse and neglect reports; and (4) removal of her staff, office and position, after she took an unapproved four-month leave under the Family Medical Leave Act.  Compl. ¶¶ 267-311.

Even if these retaliation allegations — consisting of poor performance evaluations, threatened disciplinary action, a temporary detail to a subordinate position and removal of her job responsibilities — are considered as part of her hostile work environment claim to show that the abusive environment adversely affected her employment conditions, the Second Amended Complaint simply does not show that any of the actions outlined were because of her race, age or national origin.  In view of the positive job performance evaluations she received during her detail, restoration of her supervisory position upon completion of the detail, and positive descriptions by other plaintiffs about Moore's performance in 2009, *see, e.g.*, *id.*  ¶¶ 196, 230-32, the Second Amended Complaint simply does not indicate that the allegedly hostile work

conditions unreasonably interfered with her work performance.  *See Curry v. District of Columbia*, 195 F.3d 654, 662 n.16 (D.C. Cir. 1999) (citing *Harris*, 510 U.S. at 23); *Hussain v. Gutierrez*, 593 F. Supp. 2d 1, 6-7 (D.D.C. 2008).  Thus, even considering the retaliation allegations as part of Moore's claim of hostile work environment does not cure the failure to meet the fourth element for a *prima facie* case.

In sum, despite the lengthy factual allegations asserted in the Complaint in support of the plaintiffs' claim of hostile work environment, they have failed to establish critical elements for such a claim that would "nudge" their allegations into the plausible realm.  Without plausible allegations, the claims do not survive the Motion to Dismiss.

## C.        Disparate Treatment Claims of Plaintiffs Peters, McCall and Moore

As previously noted, the Title VII and ADEA discrimination and retaliation claims of only Plaintiffs Peters, McCall and Moore survive the defendant's exhaustion challenge.  The Second Amended Complaint contains broad allegations of disparate treatment associated with a hostile work environment.  *See, e.g.,* Compl. at 2 (the defendant "discriminated against them and similarly situated employees on the basis of their race, national origin, age"); *id.* ¶ 23 (Peters) ("Similarly situated caseworkers, who were younger or not black, were not bullied by their supervisors."); *id.* ¶ 98 (McCall) (same); *id.* ¶ 250 (Moore) ("[Supervisor F] singled Ms. Moore out for abusive treatment.").  The Second Amended Complaint does not clearly distinguish the allegations underlying the hostile work environment claim from those showing disparate treatment arising from discrete discriminatory acts due to the plaintiffs' race, age and/or national origin.  *See Baird*, 662 F.3d at 1253 (noting that plaintiff's failure to segregate in the complaint those events she claims constitute a hostile work environment from discrete acts of discrimination and/or retaliation "doubtless complicates the court's task").  In any event, the

D.C. Circuit has made clear that the same acts may "simultaneously support different types of Title VII claims" since "plaintiffs are free to plead alternative theories of harm that might stem from the same allegedly harmful conduct." *Id.* at 1252. [27]

To the extent that the plaintiffs are alleging discrete discriminatory acts, the defendant contends that dismissal of the plaintiffs' disparate treatment claims is warranted because the plaintiffs "have failed to allege facts that show an adverse employment action," or that their "alleged mistreatment was because of [their] membership in a protected class." Def.'s Mem. at 18-19. As already noted, *supra* note 24, the defendant also asserts without analysis, that "[m]any of plaintiffs' allegations fall well outside of" the applicable limitations period. *Id.* at 23. The disparate treatment claims of Peters, McCall and Moore will now be evaluated *seriatim* below for their sufficiency.

### 1.    Legal Standard

Both Title VII of the Civil Rights Act and the ADEA make it "unlawful for an employer" to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age," 29 U.S.C. § 623(a)(1), or "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under both Title VII and the ADEA, "the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin [or] age. . ." *Baloch*, 550 F.3d at 1196; *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008).

An "adverse employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a

---

[27] At the same time, however, a plaintiff may not combine discrete acts to form a hostile work environment claim, "without meeting the required hostile work environment standard." *Baird*, 662 F.3d at 1252.

decision causing significant change in benefits." *Baird*, 662 F.3d at 1248 (quoting *Douglas v. Preston*, 559 F.3d 549, 552 (D.C. Cir. 2009)); *see also Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003) ("Adverse employment action . . . [entails a] tangible employment action evidenced by firing, failing to promote, a considerable change in benefits, or reassignment with significantly different responsibilities."). Thus, "not everything that makes an employee unhappy is an actionable adverse action." *Baird*, 662 F.3d. at 1250 (internal citation omitted).

"[R]esignations or retirements are presumed to be voluntary . . . ." *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006) (Rogers, J., concurring); *see also Keyes v. District of Columbia*, 372 F.3d 434, 439 (D.C. Cir. 2004); *Henn v. Nat'l Geographic Soc'y*, 819 F.2d 824, 828 (7th Cir. 1987). The doctrine of constructive discharge may apply in certain circumstances to allow an employee to overcome the presumption of voluntariness and demonstrate that the resignation or retirement constituted an adverse employment action by showing that the resignation or retirement was, in fact, not voluntary. *Aliotta v. Bair*, 614 F.3d 556, 566-67 (D.C. Cir. 2010) (citing *Rowell v. BellSouth Corp.*, 433 F.3d 794, 805 (11th Cir. 2005)); *Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 480 (1st Cir. 1993). "The test for constructive discharge is an objective one: whether a reasonable person in the employee's position would have felt compelled to resign under the circumstances." *Aliotta*, 614 F.3d at 566; *see also Steele v. Schafer*, 535 F.3d 689, 695 (D.C. Cir. 2008) (for constructive discharge, a plaintiff must show that "the abusive working environment became so intolerable that [the] resignation qualified as a fitting response") (quoting *Penn. State Police v. Suders*, 542 U.S. 129, 134 (2004)).

### 2.    Analysis

The Second Amended Complaint repeatedly alleges in general, conclusory terms that Plaintiffs Peters, Moore and McCall, along with other employees and the non-filing plaintiffs,

were "harassed" or subjected to "abusive treatment."  *See, e.g.*, Compl. ¶¶ 43-45, 47, 105-07,

114, 154-55, 157 (referring to unnamed Nigerian and Jamaican or foreign-born caseworkers

being abused).  The specific discrete discriminatory actions allegedly directed at plaintiffs Peters,

Moore and McCall must be teased out of these general assertions in order to assess the

sufficiency of their claims of disparate treatment.  Indeed, the defendant's characterization of the

plaintiffs' allegations as "disjointed" and as an effort to "throw a host of allegations of

discrimination against the wall in an apparent hope that something will stick," is fairly accurate

and not merely advocacy hyperbole.  Def.'s Mem. at 12.  The incidents of disparate treatment

alleged by Plaintiffs Peters, McCall and Moore are analyzed below.

> **a.    Alleged Disparate Treatment Actions Against Plaintiffs Peters and McCall**

The same factual allegations underlying the plaintiffs' claims of hostile work

environment are also apparently used to support the claims of discrete discriminatory actions.

*See Baird*, 662 F.3d at 1252 ("[P]laintiffs are free to plead alternative theories of harm that might

stem from the same allegedly harmful conduct.").  Both Peters and McCall claim that Supervisor

A discriminated against them by: (1) at unspecified times apparently between 2005 and 2007,[28]

threatening to write them up, Compl. ¶ 54 (Peters), ¶ 115 (McCall); and (2) in 2008, following

the Jacks tragedy and surge in child abuse and neglect reports, writing them up for having

backlogs of cases when other caseworkers with similar backlogs were not written up, *id.* ¶¶ 83-

85 (Peters), ¶¶ 131-32 (McCall).  In addition, Peters claims that, at unspecified times apparently

between 2005 and 2007, this supervisor (3) screamed and talked down to her, *id.* ¶ 52; and (4)

---

[28] While the Complaint does not provide the precise timing of the events cited, the Court discerns the time period "between 2005 and 2007" based on the chronological order in which the events are described over the years covered in the Second Amended Complaint.

took inappropriate actions, such as blocking her from leaving her desk and interrupting her conversations with co-workers or her restroom breaks. *Id.* ¶¶ 56-58.

At the outset, the Court must consider the obvious, namely, whether claims stretching back to 2005 are time-barred. The alleged adverse acts occurring in 2008 or earlier fall outside the 300-day statute of limitations for filing an EEOC complaint and are time-barred. Title VII requires "aggrieved persons" to file a charge with the EEOC within 180 days after the alleged unlawful employment practice occurred, but this period is extended to 300 days when the person has initially instituted a procedure with a state or local agency. 42 U.S.C. § 2000e-5(e)(1). A "work-sharing" arrangement between the EEOC and the District of Columbia Office of Human Rights ("DCOHR") deems timely-filed EEOC charges as cross-filed with the DCOHR, making the deadline for filing EEOC charges in the District of Columbia 300 days from the date of the alleged discrimination. *Tucker v. Howard Univ. Hosp.*, 764 F. Supp. 2d 1, 2 (D.D.C. 2011) ("In the District of Columbia, an [EEOC] charge must be filed within 300 days of the date of the alleged discrimination."); *Ellis v. Georgetown Univ. Hosp.*, 631 F. Supp. 2d 71, 78 (D.D.C. 2009) ("When a charge of discrimination is filed with the EEOC in the District of Columbia, a claim is automatically cross-filed with the D.C. Office of Human Rights ("DCOHR") pursuant to a 'worksharing agreement' between the two agencies.") (citing *Carter v. George Washington Univ.*, 387 F.3d 872, 879 (D.C. Cir. 2004)). This requirement is one of "the prerequisites that a plaintiff must satisfy before filing suit." *AMTRAK v. Morgan*, 536 U.S. 101, 109 (2002); *see also Singletary*, 351 F.3d at 523; *Currier*, 159 F.3d at 1366 & n.2; *Smith-Thompson v. District of Columbia*, 657 F. Supp. 2d 123, 131 (D.D.C. 2009) (employee claiming discrimination under Title VII must comply with this timing requirement "or lose the ability [to] recover for it.").

Peters filed her EEOC "Charge of Discrimination" on November 9, 2009, and McCall filed his charge on November 2, 2009.  Thus, only disparate treatment claims based on events occurring after January 13, 2009 for Peters and January 6, 2009 for McCall are timely. *Singletary*, 351 F.3d at 526 ("'[D]iscrete discriminatory acts' such as terminations and failures to promote . . . 'are not actionable if time barred, even when they are related to acts alleged in timely filed charges.'") (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)).  The allegations describing conduct that occurred between 2005 and 2008 are time-barred.

The only disparate treatment allegation made by Peters that appears to fall within the statutory period is that "[Superviser A] wrote up [Peters] multiple times until the warnings lead [sic] to a reprimand and the reprimand to a proposed suspension in October 2009," prompting her to resign that month.  Compl. ¶¶ 87, 93-94.  Peters alleges that her "backlog was similar to those of other members of [Supervisor A's] unit, who were not written up."  *Id.* ¶ 85.  Just as this claim was found insufficient to support the hostile work environment claim, it is insufficient to support a disparate treatment claim.  As discussed, in subsection B.2.a, *supra*, penalizing Peters for poor work performance when she concedes she "could not eliminate her backlog no matter how many hours she worked," Compl. ¶ 84, may have appeared to her to be unfair but that is a far cry from discriminating against her for her protected status.  In the context of the increased workload and pressure under which CPS was operating in the aftermath of the Jacks tragedy, the increased scrutiny and supervision given to employees is not surprising. Moreover, as discussed in connection with her claims of hostile work environment, contrary to Peters' claim that her assigned workload and reprimands for her backlog in 2009 were discriminatory, the workload

increases appear to have been shared by other caseworkers, who were similarly written up for backlogs. These claims simply do not support a claim of disparate treatment.

McCall makes no disparate treatment allegation that falls within the statutory period. Indeed, while he complains about being unfairly "written up" for his backlog of cases after the Jacks tragedy, the latest occasion he cites for such a write-up occurred "[i]n the summer of 2008." *Id.* ¶ 131. The only other incident he cites within the statutory period is that "[i]n the summer of 2009, [he] suffered a groin injury that caused him to take a week off from work," and upon his return Supervisor A told him that "she should have written him up for complaining about her a year earlier." *Id.* ¶ 137. This appears to be an allegation of retaliation rather than disparate treatment, however, and no other information is provided to assist the Court in understanding the purpose for which that allegation is made. In short, McCall has not made out a timely claim of disparate treatment.

### b.      Alleged Disparate Treatment Actions Against Plaintiff Moore

Moore claims that her supervisors from 2000 to 2008 discriminated against her by: (1) screaming at or making disparaging remarks about her, *id.* ¶¶ 263, 269; (2) regularly threatening to write her up and actually writing her up for "borderline insubordination," *id.* ¶¶ 261, 301; (3) excluding her from staff meetings and lunches, *id.* ¶¶ 255, 257, 260; (4) giving her poor job performance evaluations in 2005, 2006 and 2007, *id.* ¶¶ 274-80; and (5) detailing her to serve as a "hotline caseworker" following the Jacks tragedy, *id.* ¶ 285. To the extent that any of these allegations constitute disparate treatment, they are all time-barred. Moore filed her "Charge of Discrimination" with the EEOC on December 8, 2009, *see* ECF No. 30-3 at 1, and therefore, any allegations concerning events that occurred before February 11, 2009 are untimely.

The only allegations occurring between February 11, 2009 and her resignation in November 2009 asserted by Moore that may support a disparate treatment claim are that after Supervisor D became her supervisor in the spring of 2009, he "regularly shouted at [her] in the presence of her staff," Compl. ¶ 300, and removed her job responsibilities upon her return from an unapproved four-month FMLA leave, *id.* ¶¶ 303-08.  These allegations simply are not sufficient to state a claim of disparate treatment.  Nowhere does Moore allege that Supervisor D treated her harshly due to her protected status.  Even harsh treatment by a supervisor does not support an employment discrimination claim, absent any assertion that the treatment was due to the plaintiff's race, age or national origin.  Indeed, Moore indicates that her relationship with Supervisor D started off well, *id.* ¶ 299 ("[Supervisor D] was initially sympathetic . . ."), which is not consistent with the behavior of a supervisor motivated by racial animus.

Moreover, it strains common sense to attribute the removal of Moore's job responsibilities to disparate treatment.  Not only does she not make that allegation, she concedes that she took a four-month leave from her job that was not approved by her supervisor.

In order to meet the requirement of showing an adverse employment action for a disparate treatment claim under Title VII or the ADEA, both Peters and Moore claim that their resignations were constructive discharges.[29]  *Id.* ¶¶ 93-4 (Peters); ¶ 311 (Moore); Pls.' Mem. at 22.  McCall claims that he was forced to accept a transfer out of the CPS that reduced his take home pay.  Compl. ¶¶ 138-40.  Even assuming as true that the resignations and transfer were adverse employment actions, these plaintiffs fail to show that they were subject to any discrete

---

[29] Moore alleges in the Second Amended Complaint that she resigned, Compl. ¶ 311, and in her EEOC "Charge of Discrimination" that "[a]s of 11-23-09 I am on leave pending my retirement effective 12-31-09."  ECF No. 30-3.  Whether Moore resigned or retired is immaterial since under either circumstance the Court will construe her allegation as one of constructive discharge.

acts of discrimination because of their race, age or national origin and therefore that there was any causal connection to their resignations or transfer.

### D.  Retaliation Claims of Plaintiffs Peters, McCall and Moore

Plaintiffs Peters, McCall and Moore each claim that they were retaliated against for complaining about the discriminatory conduct of their supervisors. The defendant contends that "the Complaint itself shows there was a legitimate reason for the purportedly retaliatory acts" and therefore the plaintiffs fail to make out a *prima facie* case of retaliation. Def.'s Mem. at 19. The Court agrees that the retaliatory acts alleged are either time-barred or are insufficient as a matter of law.

### 1.  Legal Standard

Title VII makes it an unlawful employment practice for an employer:

> to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that "(1) he engaged in protected activity; (2) he was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action." *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012) (quoting *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007)); *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007); *Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005); *Morgan v. Fed. Home Loan Mortg.Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003); *Singletary*, 351 F.3d at 524; *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985).

As to the first element, protected activity encompasses utilizing informal grievance procedures such as complaining to management or human resources about the discriminatory conduct. *Richardson v. Gutierrez*, 477 F. Supp. 2d 22, 27 (D.D.C. 2007) ("It is well settled that Title VII protects informal, as well as formal, complaints of discrimination."); *see also Bell v. Gonzales*, 398 F. Supp. 2d 78, 94 (D.D.C. 2005) ("Initiation of EEO counseling to explore whether an employee has a basis for alleging discrimination constitutes protected activity, even in the absence of an unequivocal allegation of discrimination.").

A plaintiff meets the second element to show a *prima facie* case of retaliation if "a reasonable employee would have found the challenged action materially adverse," meaning that it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("*Burlington Northern*"). Thus, adverse actions giving rise to retaliation claims are broader than for disparate impact claims and are "not limited to discriminatory actions that affect the terms and conditions of employment," but reach any harm that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Baird*, 662 F.3d at 1249 (quoting *Burlington Northern*, 548 U.S. at 68). Yet, the Court in *Burlington Northern* distinguished "materially adverse" actions from "trivial harms," "petty slights," and "minor annoyances." *Id.* at 68. The Court also noted that "[c]ontext matters" and "the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 69; *see also id.* ("[A]n act that would be immaterial in some situations is material in others.") (citation omitted). As discussed above, resigning, retiring or transferring from a position, as plaintiffs Peters, Moore and McCall did, respectively, may constitute an adverse employment action of constructive discharge or involuntary transfer if the plaintiff shows that the resignation,

retirement or transfer occurred under conditions that forced that choice.  *Baird*, 662 F.3d at 1248-49.

Finally, the third element of the test requiring a causal link between the protected activity and the adverse employment action may be satisfied merely by close temporal proximity between the two events.  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting that the temporal connection must be "very close": a three-or four-month period between an adverse action and protected activity is insufficient to show a causal connection, and a twenty-month period suggests "no causality at all"); *Hamilton*, 666 F.3d at 1357 ("[T]emporal proximity can indeed support an inference of causation, but only where the two events are very close in time.") (quoting *Woodruff*, 482 F.3d at 529).

Significantly, however, even if the plaintiff establishes a *prima facie* case of retaliation, dismissal may still be warranted for failure to state a claim if the defendant shows a legitimate non-discriminatory reason for its actions.  *See Broderick v. Donaldson*, 437 F.3d 1226, 1231 (D.C. Cir. 2006).  Such a legitimate reason breaks the causal connection between the first two elements and defeats a retaliation claim.  Then "the court must simply determine whether the plaintiff has put forward enough evidence to defeat the proffer and support a finding of retaliation."  *Bright v. Copps*, No. 08-755, 2011 U.S. Dist. LEXIS 142160, at *23 (D.D.C. Dec. 9, 2011) (citing *Woodruff*, 482 F.3d at 530); *McGrath v. Clinton*, 666 F.3d 1377, 1383 (D.C. Cir. 2012).

### 2.    Analysis

Set against the applicable legal standard for showing a *prima facie* case of retaliation, the retaliation claims of Peters, McCall and Moore fall short.  The retaliation claims of these three plaintiffs are discussed below.

### a.      Retaliation Claims of Plaintiffs Peters and McCall

Both Peters and McCall allege that they engaged in protected activity on two occasions. First, in 2007, they complained to management personnel about the abusive conduct of Supervisor A, resulting in a meeting convened by Supervisor B at which they "accused Supervisor A of race discrimination."  Compl. ¶¶ 69-73, 119-21.  Although they were assured "that there would be no retaliation," Supervisor A "became very hostile."  *Id*. ¶¶ 73, 123. Second, "in 2008 and 2009," Peters and McCall lodged complaints with Supervisors C and D about Supervisor A's actions in writing them up and threatening penalties for their backlog of cases in the aftermath of the Jacks tragedy, even though other caseworkers in the unit with similar backlogs were not written up.  *Id*. ¶¶ 79-89, ¶¶ 128-32.  According to Peters and McCall, despite their complaints to management about Supervisor A's treatment, "neither [Supervisor C or D] took steps to end the abuse."  *Id*. ¶ 88; *see also id*. ¶ 133.  Their requests for transfer were denied.  *Id*. ¶¶ 89, 134.  When poor job evaluations led to a proposed suspension in October, 2009, Peters resigned.  *Id*. ¶ 93.  When Supervisor D advised McCall that he was facing a write-up, McCall transferred out of CPS in August, 2009.[30]  *Id*. ¶ 138.

At the outset, again, the Court must consider the timeliness of these allegations of retaliation that date back to 2007.  The first allegation of retaliation in the form of increased hostility from Supervisor A towards Peters and McCall appears to be time-barred.  The vague timing set forth in the Second Amended Complaint indicates that the increased hostility of Supervisor A began in 2007 and, therefore, occurred long before the statutory 300-day period in January 2009 before the filing of these plaintiffs' EEOC charges.  In any event, even if this allegation of retaliation were considered to be timely, the claim does not survive the Motion to

---

[30] In their opposition brief, the plaintiffs state that McCall transferred out of CPS "after being threatened by [Supervisor A] with a write up that he felt would lead to his termination," Pls.' Mem. at 23, but the Complaint attributes this final write-up threat to Supervisor D.  Compl. ¶138.

Dismiss.  Other than increased hostility from Supervisor A, neither Peters nor McCall assert that they were subjected to an adverse employment action in connection with their 2007 complaint to management about Supervisor A's mistreatment of them.  Thus, this allegation simply cannot plausibly support a retaliation claim.

With regard to the second incidence of retaliation, the Second Amended Complaint is not entirely clear when "[i]n 2008 and 2009" Peters made informal complaints to program managers Supervisors C and D "about [Supervisor A] . . . to end the abuse."  Compl. ¶ 88.  No dates whatsoever are provided for when McCall "complained to several managers, including [Supervisors C and D], about [Supervisor A's] abusive behavior."  *Id.* ¶ 133.  Nevertheless, both Peters and McCall allege that following these complaints, nothing changed and presumably Supervisor A's abusive conduct continued.  Even assuming that these allegations are timely, they are insufficient to support a claim of retaliation for several reasons.

First, the Court finds that Peters and McCall's complaints to Supervisor C and D do not clearly constitute protected activity.  While informal complaints to management may constitute protected activity, the plaintiffs must clearly complain about discriminatory treatment.  While the Second Amended Complaint suggests that Peters and McCall complained to management about Supervisor A assigning them too many cases and then penalizing them for a backlog when other caseworkers were not penalized, they do not allege that they complained about being targeted for this harsher treatment due to their race, age or national origin or even in retaliation for their prior complaints about her.

Second, the fact that nothing changed after they complained in 2008 and 2009 about Supervisor A to Supervisors C and D undercuts their claims of retaliation.  According to the allegations, even after they complained, "the abuse" from Supervisor A continued in the form of

too many cases and the imposition of performance penalties for their backlogs.  In other words, their allegations do not even suggest that following their complaints, Supervisor A became more hostile, penalized them more severely or assigned them even more cases than before their complaints as retaliation for their complaints.

Third, the adverse employment actions that Peters and McCall allege to have stemmed from their 2008 and 2009 complaints to Supervisors C and D do not appear to be causally connected, even if those complaints were deemed to be protected activity.  The allegations can be construed to identify three adverse employment actions: denial of transfers, unfair penalties for their backlogs of cases and constructive discharge or transfer.  The defendant argues that "the Complaint itself shows there was a legitimate reason for the purportedly retaliatory acts."  Def.'s Mem. at 19.  Specifically, the defendant contends that the Complaint's acknowledgement of the surge in reported child abuse and neglect cases following the January 2008 Jacks tragedy provides "a legitimate nondiscriminatory . . . reason for the increased workload that was entirely divorced from any alleged protected activity."  *Id*. at 20.  The defendant is correct.

Regarding the denial of transfer requests from both Peters and McCall, Compl. ¶¶ 89, 134, it is not entirely clear whether this allegation is meant to indicate an adverse employment action.  Assuming it is so intended, however, it does not suffice.  The denial of their transfer requests at a time when CPS was handling a "surge in child abuse and neglect reports," *id*. ¶ 76, and at least one co-plaintiff Augustine Ekwem alleges that he had too many caseworkers to supervise, *id*. ¶¶ 473-78, more plausibly appears to have been a reasonable management decision under the circumstances, rather than a retaliatory act.  Denial of requests for transfer, without any allegation that requiring an employee to stay in an assigned position for which the objective terms of pay, rank, and general tasks have remained the same, simply do not constitute an

adverse action to support a retaliation claim.  *See Bright v. Copps*, No. 08-0755, 2011 U.S. Dist.

LEXIS 142160, at *40 (D.D.C. Dec. 9, 2011) (plaintiff's claim that she was denied

reassignment, without identifying any "objectively tangible harm" resulting from defendant's

refusal to reassign her, was not enough to show "how this denial could possibly dissuade a

reasonable worker from 'making or supporting a charge of discrimination.'"); *Dorns v. Geithner*,

692 F. Supp. 2d 119, 132-34 (D.D.C. 2010) (finding that refusal of transfer request, poor

performance review, refusal to permit attendance at training session and denial of advancement

for sick leave, did not in aggregate constitute adverse employment action).

Regarding the assignment of cases and penalties for backlogs, it is not plausible to view

these as retaliatory acts given the other allegations in the Second Amended Complaint.  Peters

alleges that she was assigned an "overwhelming number of cases" and admits that her backlog

was growing and she "could not eliminate" it.  Compl. ¶¶ 79-84.  Likewise, McCall had a

growing backlog and an "overwhelming caseload."  *Id.* ¶¶ 127-29.  Both Peters and McCall were

long-term CPS employees and therefore it is reasonable that management would expect them to

be able to handle more cases than less experienced caseworkers.  While Peters and McCall may

perceive that they were treated more harshly than others in the unit, the job performance

penalties meted out to them due to their backlogs were not unfounded and other allegations in the

Second Amended Complaint undercut their claim that they were the only caseworkers with, and

penalized for, their backlogs.  *See, e.g.*, Compl. ¶¶ 176-84, 215-17.  *See also Lester v. Natsios*,

290 F. Supp. 2d 11, 29-30 (D.D.C. 2003) ("[I]ncreased workloads and undesirable work

assignments of which plaintiff complains also do not rise to the level of adverse employment

actions . . . but rather constitute only the ordinary tribulations of the workplace, which employees

should expect.") (internal quotations omitted); *Mack v. Strauss*, 134 F. Supp. 2d 103, 113

(D.D.C. 2001), *aff'd,* No. 01-5122, 2001 U.S. App. LEXIS 24097 (D.C. Cir. Sept. 28, 2001) (allegedly increased workload does not constitute actionable injury where not accompanied by adverse change in terms, conditions or privileges of employment); *Brodetski v. Duffey*, 199 F.R.D. 14, 21 (D.D.C. 2001) (holding that plaintiff had not shown an adverse employment action sufficient to establish a *prima facie* case of retaliation based upon*, inter alia*, the assignment of "a disproportionate amount of work" to him in a "pattern of 'deliberate overloading,'" combined with plaintiff's unhappiness over supervisor's personnel assignments and written reprimand); *see also Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997) ("[C]hanges in assignments or work-related duties do not ordinarily constitute adverse employment decisions.").

Finally, Peters and McCall appear to assert that the manner in which they left CPS was an adverse employment action caused by the retaliatory action of Supervisor A.  Peters alleges that she resigned due to Supervisor A writing her up "multiple times until the warnings lead [sic] to a reprimand and the reprimand lead [sic] to a proposed suspension in October 2009."  Compl. ¶ 87. McCall alleges he transferred out of CPS when Supervisor D advised him that he was facing a "[write-up]."  *Id*. ¶ 138.  The causal links between Peters' resignation and McCall's decision to transfer and the retaliatory acts are too tenuous, however.  McCall never alleges that he complained about Supervisor D, who was about to issue the write-up.  *See Perry v. Clinton*, No. 08-cv-1216, 2011 U.S. Dist. LEXIS 147034, at *62 (D.D.C. Aug. 29, 2011) (holding no causal link established between protected activity and retaliation when plaintiff "provided no evidence or argument explaining why [supervisor] would decide to retaliate against *her* because she filed a complaint against someone else.") (emphasis in original).  Moreover, Supervisor A's case assignments and reprimands for backlogs to both plaintiffs had occurred *before* they complained about these actions and the fact that these actions continued unabated after their complaints does

not show that they were retaliatory, but more plausibly that they were a result of the surge in child abuse cases and increased performance pressure under which CPS and its management were operating after the Jacks tragedy.

In any event, the defendant contests Peters and McCall's claims that her resignation and his transfer were involuntary and constitute a constructive discharge and a "constructive involuntary transfer," respectively.  The defendant contends neither plaintiff has alleged a work environment so intolerable that resignation or transfer was the fitting response or that their alleged mistreatment was because of their "membership in a protected class."  Def.'s Mem. at 18-19.  In circumstances, as here, "where a plaintiff has failed to state a hostile working environment," the defendant concludes, "he or she simply cannot state a claim for constructive discharge" or constructive involuntary transfer.  *Id*. at 18.  The Court agrees.  *Sewell v. Hugler*, No. 08-5079, 2009 U.S. App. LEXIS 4136, at *3 (D.C. Cir. Feb. 25, 2009) (unpublished) ("[T]he district court correctly concluded that the failure of Sewell's constructive discharge claim follows *a fortiori* from the failure of her other claims" of hostile work environment.); *McKeithan v. Boarman*, 803 F. Supp. 2d 63, 70 n.5 (D.D.C. Aug. 17, 2011) ("[B]ecause [plaintiff] has failed to show that his working environment was hostile, he cannot establish that he was constructively discharged."); *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992), *aff'd on other grounds*, 511 U.S. 244 (to prove constructive discharge, the plaintiff must "demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment.").  To the extent that Peters seeks to use her resignation and McCall use his transfer to show the requisite adverse employment action to support their retaliation claims, the effort is unavailing.

For these reasons, the retaliation claims of Peters and McCall must be dismissed.

### b.      Retaliation Claim of Plaintiff Moore

Plaintiff Moore alleges four instances in which she complained about mistreatment from her supervisors: (1) in 2001, she complained to "human resources" about Supervisor F after this supervisor requested that Moore not speak at a meeting and screamed at her, and Moore's complaint prompted an apology from this supervisor, Compl. ¶¶ 257-59; (2) in 2005, she complained to "human resources" and the "Employee Assistance Program" about Supervisor G screaming at her, *id.* ¶¶ 269-72; (3) in 2007, she complained to "human resources" about Supervisor G's poor evaluation of her based on "the fact that [she] had filed complaints against him with human resources," *id.* ¶¶ 280-81; and (4) in 2009, she complained to Supervisor D about retaliatory treatment from her prior Supervisors G and F, and Moore alleges that Supervisor D then "became abusive as well." *Id.* ¶¶ 297-99.

The Complaint is not clear whether Moore claims that all four instances in which she complained about her three supervisors over the course of eight years is protected activity that prompted retaliation. Since she filed her EEOC charge on December 8, 2009, however, any claims of retaliation occurring prior to February 11, 2009 are time-barred. Neither party addresses the timeliness issue in any detail, however. Indeed, the plaintiffs' opposition memorandum focuses on the first three instances of her complaints to human resources. Specifically, Moore asserts that her claim of retaliation is established because, after lodging her complaints, presumably in 2001, 2005 and 2007, about Supervisors G and F, "she was transferred to a non-supervisory position; and there is a causal link between her complaint[s] about [those supervisors] and her detail to a non-supervisory position." Pls.' Mem. at 24.[31]

---

[31] Moore does not appear to contend that her alleged constructive discharge was an adverse employment action in retaliation for her complaints about her supervisors. Indeed, the multiple years between her complaints about

Even if the Court were to assume this claim was timely, Moore has not sufficiently alleged protected activity or a causal link to support her retaliation claim.

This Circuit has made clear that, "[n]ot every complaint garners its author protection under Title VII." *Broderick*, 437 F.3d at 1232 (plaintiff's written complaint to her supervisors did not constitute a protected activity because she complained of her treatment but did not allege that she was suffering discrimination or retaliation); *see also Lewis v. District of Columbia*, No. 07-0429, 2010 U.S. Dist. LEXIS 93299, at *34-35 (D.D.C. Sept. 8, 2010) (plaintiff's retaliation claim dismissed since her complaints of mistreatment do not qualify as protected activity absent any allegation that these complaints contained allegations of discrimination or retaliation); *Beyene v. Hilton Hotels Corp.*, No. 08-1972, 2011 U.S. Dist. LEXIS 112227, at *23-24 (D.D.C. Sept. 30, 2011) (plaintiff "must demonstrate that he complained of some unlawful discrimination based on his membership in a protected class" and, absent allegation that his complaint about supervisors' harassment referred to his religion or national origin, his retaliation claim fails). The Second Amended Complaint contains no allegation that when Moore complained to human resources about her mistreatment by Supervisors G and F, she stated that she was being discriminated against. "While no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition," to qualify as protected activity. *Broderick*, 437 F.3d at 1232. Moore has failed to meet this requirement.

---

Supervisors F and G and her resignation would defeat any causal connection between those events. Moreover, her claim of constructive discharge stems from her allegation that her job responsibilities were removed following her return from a four month leave under the Family and Medical Leave Act (FLMA). *Id.* ¶¶ 303-11. When she requested the leave, her supervisor "told Ms. Moore that her request would not be approved." *Id.* ¶ 304. Nevertheless, Moore took the leave, returning to work in October, 2009 to "discover[] that [CFSA] had stopped her paychecks, removed her name from the computer system, and given her position, office and staff to a newly hired employee." *Id.* ¶ 308. There is no allegation that Moore's leave request was denied for any discriminatory reason or that any other similarly situated supervisors were granted leave requests when her request was denied. Taking a leave for an extended period of four months after a supervisor has communicated that the leave was not approved provides a legitimate reason for the actions taken by CFSA and would defeat her claim of constructive discharge.

Even assuming that the complaints Moore made to human resources in 2001, 2005 and 2007 preceding her detail as a "hotline caseworker," were timely and statutorily protected activity, she would still fail to state a cognizable retaliation claim for two reasons.  First, her temporary detail does not constitute an adverse employment action.  The Second Amended Complaint is replete with allegations about the surge in child abuse and neglect reports after the Jacks tragedy that overwhelmed the caseworkers at CPS with backlogged cases.  Moore was one of four supervisors re-assigned to CPS to assist with this surge in cases.  While Moore alleges that she was the only such supervisor demoted to caseworker, she does not allege that her pay was docked or her benefits diminished in any way or that this temporary re-assignment had any practical consequences.  *See Mungin*, 116 F.3d at 1557 ("[C]hanges in assignments or work-related duties do not ordinarily constitute adverse employment actions if unaccompanied by a decrease in salary or work hour changes."); *Ndondji v. Inerpark Inc*., 768 F. Supp. 2d. 264, 282 (D.D.C. 2011) (transfer to undesirable location was not materially adverse employment action since plaintiff did not allege any "'objectively tangible harm' such as a decrease in salary or benefits"); *Martin v. Locke*, 659 F. Supp. 2d 140, 148 (D.D.C. 2009) (finding plaintiff failed to show that her job transfer constituted an adverse employment action when she did not allege her pay or grade was reduced).  The fact that she felt "humiliated" is unfortunate but does not turn this event into an adverse employment action.  *See Baird*, 662 F.3d at 1249 (alleged episodes are "akin to the sort of 'public humiliation or loss of reputation' that . . .  fall[] below the requirements for an adverse employment action").

Even if the tangible benefits remain the same, a transfer that involves the permanent withdrawal of an employee's supervisory responsibilities may amount to a demotion and an adverse employment action.  *See Geleta v. Gray*, 645 F.3d 408, 412 (D.C. Cir. 2011) (materially

adverse employment action due to retaliation may be shown where plaintiff provides evidence that he was transferred from supervisory position overseeing twenty employees to a desk job where he supervised no one); *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 608 (D.C. Cir. 2010) (allegedly retaliatory transfer from a legal to non-legal job could qualify as an adverse employment action); *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007).  By contrast to these cited cases, however, Moore's transfer was not permanent.  Furthermore, in the context of the serious workload increase that CPS faced, as described by the plaintiffs in their Complaint, the legitimate reasons for management's temporary re-assignment of Moore to assist in addressing the serious surge in reports of child neglect and abuse, appears to have been appropriate.  *Baloch*, 550 F.3d at 1191 (courts should not engage in "judicial micromanagement of business practices by second-guessing employers' decisions.") (citation omitted).  In fact, Moore alleges that she was very effective in her detailed position and "closed approximately a thousand investigations."  Compl. ¶ 290.  Rather than a discriminatory or retaliatory action, her temporary re-assignment appears to have been a sound administrative step to make effective use of personnel to deal with a significant workload problem.  Moreover, Moore was reinstated to her supervisory position one year after her detail and "given a staff."  Compl. ¶ 292.  This is probative evidence that the management decision to give her a temporary detail did not have invidious motivation since that would be inconsistent with the decision to reinstate her.  In other words, her claim is "seriously undercut" by the allegation that the same managers who discriminated against her also reinstated her.  *Waterhouse v. District of Columbia*, 298 F.3d 989, 996 (D.C. Cir. 2002) (attributing racial animus to person who hired plaintiff "seriously undercut" claim that plaintiff was terminated on account of her race); *see also Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) (fact that employer initially selected plaintiff "is

probative evidence that [employer] did not discriminate against [plaintiff] on account of her race or gender when he dismissed her later that year").

Second, the complaints she made in 2001, 2005 and 2007 to human resources are not close in time to when she was detailed to be a caseworker. This undermines significantly any causal link between the purported protected activity and the allegedly retaliatory temporary re-assignment.

In sum, Moore has failed to allege that she engaged in protected activity and, even if she did, her temporary re-assignment does not constitute an adverse employment action, let alone a retaliatory act caused by her complaints, sufficient to state a claim for retaliation.

Accordingly, the defendant's motion to dismiss the claims of retaliation by Plaintiffs Peters, McCall and Moore is granted.

### E.     Constitutional Claims Under 42 U.S.C. § 1983 and § 1981

The plaintiffs assert discrimination claims under 42 U.S.C. § 1983 and § 1981, "which do not require administrative exhaustion." Pls.' Mem. at 11. Specifically, the Second Amended Complaint states that "Defendants['] acts, policies, practices and procedures . . . violated Plaintiffs' rights secured by the Due Process Clause of the Fifth Amendment to the U.S. Constitution." Compl., Prayer for Relief at 58(a). Evaluation of the factual allegations pertinent to each of these constitutional claims asserted on behalf of all nine plaintiffs would be a challenge since, as the defendant points out, "[p]laintiffs make no effort to tie these claims to a specific statute." Def.'s Mem. at 12. Nevertheless, the claims suffer the fatal flaw of not sufficiently alleging a custom or practice of the municipality to support them.

1.      **Legal Standard**

Section 1983 authorizes equitable relief and compensatory damages against "[e]very person who, under color of any [law] . . . custom, or usage, of any State or . . . the District of Columbia, subjects, or causes to be subjected . . . any . . . person . . . to the deprivation of any rights . . . secured by the Constitution and laws . . . ." 42 U.S.C. §1983.  To state a claim under section 1983, plaintiffs must allege facts sufficient to show not just a constitutional violation, but that the District of Columbia had a policy or custom that caused the alleged violation of their constitutional rights.  *Jones v. Horne*, 634 F.3d 588, 601 (D.C. Cir. 2011); *Warren v. District of Columbia*, 353 F.3d 36, 38-39 (D.C. Cir. 2004); *see also Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690-91 (1978); *Garnes-El v. District of Columbia*, No. 08-2233, 2012 U.S. Dist. LEXIS 8961, at *8 (D.D.C. Jan. 25, 2012).  The District, as a municipal corporation, is a "person" for purposes of section 1983 liability.  Plaintiffs may show causation exists in several ways: (1) if "the municipality or one of its policymakers explicitly adopted the policy that was 'the moving force of the constitutional violation'" *id.* at 20 (quoting *Warren*, 353 F.3d at 39); (2) if "a policymaker . . . knowingly ignore[d] a practice that was consistent enough to constitute custom," *Warren*, 353 F.3d at 39 (citation omitted); or (3) if the District government failed to respond "'to a need . . . in such a manner as to show deliberate indifference to the risk that not addressing the need will result in constitutional violations.'"  *Warren*, 353 F.3d at 39 (quoting *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003)) (internal quotation marks removed).  The D.C. Circuit has made clear that causation involves more than mere negligence, and "means that, faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the [District government] may not adopt a policy of inaction."  *Warren*, 353 F.3d at 39.

A cause of action under § 1981 may be brought when a plaintiff has suffered an injury flowing from the racially-motivated breach of his contractual relationship with another party. *Domino's Pizza v. McDonald*, 546 U.S. 470, 480 (2006).  Violation of the rights guaranteed by § 1981 by state entities can be remedied exclusively through the cause of action for damages created by § 1983.  *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989).  To prevail on a claim under § 1981 against the District, therefore, a plaintiff must show that the violation of his "'right to make contracts' protected by § 1981 was caused by a custom or policy within the meaning of *Monell* and subsequent cases."  *Id.* at 735-36; *Hamilton v. District of Columbia*, 720 F. Supp. 2d 102, 113-14 (D.D.C. 2010).

### 2.      Analysis

The plaintiffs' allegations do not establish that a custom, policy or practice of the District of Columbia caused their alleged injuries, which is fatal to their claims under 42 U.S.C. §§ 1981 and 1983.  Other than conclusory allegations in the prefatory section of the Second Amended Complaint, the plaintiffs do not allege that any District official explicitly condoned, knowingly ignored, or failed to respond in a manner showing deliberate indifference to discriminatory activity based on race, age or national origin within CFSA.  On the contrary, the allegations make clear that steps were taken to address perceived or overt discriminatory activity at CFSA. For example, when employees complained of abusive conduct on the part of Supervisor A, Supervisor B convened a meeting about the complaints and assured employees, including some of the plaintiffs, that there would be no retaliation.  Compl. ¶¶ 71-72, ¶¶ 119-22.  Similarly, when a Nigerian caseworker and African-American employee had an altercation in the workplace and yelled racial epithets, "both workers were suspended."  *Id.* ¶¶ 536-40.  When Moore complained

about Supervisor F's conduct towards her in 2001, Supervisor F was prompted to apologize to her. *Id*. ¶ 259.

Moreover, among the plaintiffs are several supervisors and management personnel who allege expressly that they took actions to stop any perceived discrimination or retaliation. For example, plaintiff Courts-Marshall, who was "put in charge of the Child Protective Services Administration at the Child and Family Services Agency," *id*. ¶ 570, alleges that she "refused to fire any of the people on the list" whom she believed were put on the list "for retaliatory reasons." *Id*. ¶¶ 617-18. She also instructed "program managers," who are mid-level management at CFSA, to help "supervisors whose names were on the list." *Id.* ¶ 620. In fact, she alleges that she "launched a campaign to make sure that all social workers had the training and support they needed to perform their jobs." *Id.* ¶ 619. In addition, plaintiff Meade was a training supervisor in CPS and she claims that "Human Resources offered diversity training on topics like race discrimination and sexual harassment . . ." *Id.* ¶ 514. These allegations make clear that the District did not have a custom or policy that caused any alleged injuries of the plaintiffs.

Accordingly, the plaintiffs' discrimination claims under 42 U.S.C. § 1983 and § 1981 cannot be sustained and will be dismissed.

### F.    District of Columbia Human Rights Act Claims

The Second Amended Complaint asserts that the plaintiffs notified the Mayor's office of the instant civil action against the city on December 21, 2009, and that the "District of Columbia Government's Office of Risk Management reviewed the claims, determined that none were tort issues, and closed the files." Compl. ¶ 5. Among the claims asserted is one for declaratory and injunctive relief and damages to protect and redress "deprivation of rights secured by the District of Columbia Human Rights Act of 1977" ("DCHRA"). *Id*. ¶ 12. The defendant argues that the

plaintiffs failed to comply with the notice requirements of D.C. Code § 12-309, which operates as a six-month statute of limitations for certain claims asserted against the District of Columbia. and therefore plaintiffs' DCHRA claims should be dismissed.[32]

The defendant is correct that D.C. Code § 12-309 operates as a six-month statute of limitations for certain claims asserted against the District of Columbia.  It is well settled that state law notice requirements apply only to state law claims and do not bar federal question claims.  *Morton v. District of Columbia Hous. Auth.*, 720 F. Supp. 2d 1, 6 (D.D.C. 2010) (citing *Daskalea v. District of Columbia*, 227 F.3d 433, 446 (D.C. Cir. 2000) ("The six-month notice requirement of the D.C. Code does not apply to plaintiff's claim under section 1983.")); *Candido v. District of Columbia*, 242 F.R.D. 151, 158-59 (D.D.C. 2007) (holding that the notice requirement of D.C. Code § 12-309 does not bar federal due process claim)).  Thus, the only claim asserted by plaintiffs subject to D.C. Code § 12-309 is the DCHRA claim.

D.C. Code § 12-309 provides that:

> An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage.  A report in writing by the Metropolitan Police Department, in regular course of duty, is a sufficient notice under this section.

Here, plaintiffs filed this lawsuit on October 28, 2009 and filed their first amended complaint, which added several new plaintiffs, on December 10, 2009.  According to their Second Amended Complaint, plaintiffs allege that they "notified the Mayor's Office of this civil

---

[32] A motion to dismiss pursuant to Rule 12(b)(6) rather than Rule 12(b)(1) of the Federal Rules of Civil Procedure is appropriate because "Section 12-309 is not jurisdictional . . . Unlike a jurisdictional bar, the Section 12-309 ground for dismissal of an action is simply a 'penalty for noncompliance.'"  *Blocker-Burnette v. District of Columbia*, 730 F. Supp. 2d 200, 202 & n.2 (D.D.C. 2010) (quoting *Sanders v. District of Columbia*, No. 97-1238, 2002 U.S. Dist. LEXIS 6818, at *5 (Apr. 15, 2002)).

action against the District of Columbia on December 21, 2009." Compl. ¶ 5. However, a party must provide notice under § 12-309 *prior* to filing a lawsuit. *See Campbell v. District of Columbia*, 568 A.2d 1076, 1077-78 (D.C. 1990) (holding that "notice must have been given before suit"); *McGee v. District of Columbia*, 646 F. Supp. 2d 115, 121 (D.D.C. 2009) ("[T]he claims . . . are barred because the plaintiff did not provide notice to the mayor until after filing his lawsuit."). Any notice provided on December 21, 2009, therefore, would not satisfy the requirements of D.C. Code § 12-309.

Plaintiffs argue that D.C. Code § 12-309 only applies to "personal injury and property damage claims," Pls.' Mem. at 29, but courts have specifically held that D.C. Code § 12-309 applies to DCHRA actions. *See Giardino v. District of Columbia*, 252 F.R.D. 18, 23 (D.D.C. 2008); *see also Owens v. District of Columbia*, 993 A.2d 1085, 1087-89 (D.C. 2010). Accordingly, plaintiffs' claims under the DCHRA must be dismissed.

## V. PLAINTIFFS-INTERVENORS' MOTIONS TO INTERVENE

The plaintiffs seek to double the number of plaintiffs in this suit with two motions to permit nine additional current or former employees of CFSA to intervene as plaintiffs of right, under either Rule 24(a)(2), or permissively, under Rule 24(b). FED. R. CIV. P. 24; Movants' Mot. to Intervene, ECF No. 24 ("First Motion"); Movants' Second Mot. to Intervene, ECF No. 27 ("Second Motion").[33] Since the Court has granted the defendant's motion to dismiss the Second Amended Complaint, the motions to intervene must be denied as moot. Even if any part of the original claims remained, the motions to intervene would be denied on the merits for the reasons set forth below.

---

[33] The Court notes that the First Motion seeks intervention "pursuant to FED. R. CIV. P. 24(a)," yet asks for "permissive intervention as plaintiffs in this action." First Motion, at 1. The Second Motion simply does not specify under which prong of Rule 24 the Movants seek to intervene. Second Motion, at 1-3. Nevertheless, the Court construes these motions as seeking intervention both as of right and permissively. *See* Movants' Reply Mem., ECF No. 26, at 1 (clarifying that Movants are seeking intervention under Rule 24(a) "and/or" Rule 24 (b)).

The defendant opposes both of the motions to intervene.  Def.'s Opp'n to First Mot. to Intervene ("Def.'s Opp'n First Mot."), ECF No. 25; Def.'s Opp'n to Second Mot. to Intervene ("Def.'s Opp'n Second Mot."), ECF No. 28.  The defendant contends that the nine would-be plaintiff-intervenors ("Movants") should not be granted leave to intervene since the allegations underlying their claims are sufficiently different that the requirements for intervention under both Rule 24(a)(2) and (b) are not satisfied.  The Court agrees.

In the discussion that follows, the Court will first review the legal standards applicable to both prongs of Rule 24 and then describe in detail the Movants' claims, in order to evaluate the differences in those claims from those of the plaintiffs, since those differences are the basis for the defendant's objection to these motions.  Finally, the Court will assess the merits of the motions for intervention based upon the applicable legal standards.

### A.      Legal Standard For Intervention

Rule 24 of the Federal Rules of Civil Procedure sets forth the requirements for both intervention as of right and permissive intervention.  *See* FED. R. CIV. P. 24 (a) & (b).  While "[i]n theory" a court has "no discretion when intervention is under Rule 24(a)," 7C Wright, Miller & Kane, Federal Practice & Procedure, § 1913 (3d ed. 2007), practically speaking, even this basis for intervention involves "a measure of judicial discretion . . . ."  *Fund for Animals v. Norton*, 322 F.3d 728, 732 (D.C. Cir. 2003) (citing *Mass. Sch. of Law at Andover v. United States*, 118 F.3d 776, 779 (D.C. Cir. 1997) (noting "the existence of district court discretion over the timeliness and adequacy of representation issues under Rule 24(a)(2)")).  If there is no right to intervene under Rule 24(a), "it is wholly discretionary with the court whether to allow intervention under Rule 24(b)," but only if the movant 'has a claim or defense that shares with the main action a common question of law or fact.'"  7C Wright, Miller & Kane, Federal Practice & Procedure, § 1913 (3d ed. 2007) (quoting FED. R. CIV. P. 24(b)(1)(B)).  The movants' motions

will be considered under each prong of Rule 24.

### 1.      Intervention of Right

Rule 24(a)(2) states in relevant part:

> On timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

The Court of Appeals for the D.C. Circuit has parsed the language of Rule 24(a)(2) to require four factors in order for a movant to qualify for intervention of right: "(1) the timeliness of the motion; (2) whether the applicant claims an interest relating to the property or transaction which is the subject of the action; (3) whether the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest; and (4) whether the applicant's interest is adequately represented by existing parties." *Fund for Animals*, 322 F.3d at 731 (quoting *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1074 (D.C. Cir. 1998)); *Karsner v. Lothian*, 532 F.3d 876, 885 (D.C. Cir. 2008).  Additionally, the proposed intervenor seeking to participate on equal footing with the original parties to the suit must demonstrate standing under Article III of the Constitution.  *Jones v. Prince George's Cnty.*, 348 F.3d 1014, 1017 (D.C. Cir. 2003) ("[P]rospective intervenors in this circuit must possess standing under Article III of the Constitution."); *Norton*, 322 F.3d at 731-32; *United States v. Philip Morris USA*, 566 F.3d 1095, 1146 (D.C. Cir. 2009); *Ctr. for Biological Diversity v. EPA*, 274 F.R.D. 305, 308 (D.D.C. 2011); *In re ESA Litig.*, 270 F.R.D. 1, 4 (D.D.C. 2010).

To establish standing under Article III, a prospective intervenor must show: (1) he or she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the

defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002). The requisite showing for standing of injury-in-fact and causation are closely related to the second and third factors under Rule 24(a), which require a showing of interest in the subject matter of the lawsuit and the potential impairment of that interest absent intervention in the suit. *See, e.g.*, *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003) ("[A]ny person who satisfies Rule 24(a) will also meet Article III's standing requirement."); *Defenders of Wildlife v. Jackson*, No. 10-1915, 2012 U.S. Dist. LEXIS 35750, at *10 (D.D.C. Mar. 18, 2012) (noting that outcome is the same whether standing is considered separately or as part of Rule 24(a)(2) interest requirements); *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 1, 7 (D.D.C. 2008) ("The standing inquiry is repetitive in the case of intervention as of right because an intervenor who satisfies Rule 24(a) will also have Article III standing.").

### 2.      Permissive Intervention

Rule 24(b) authorizes permissive intervention for a movant who timely files a motion where a federal statute confers a conditional right to intervene or the applicant's claim or defense has a question of law or fact in common with the main action. *District of Columbia v. Potomac Elec. Power Co.*, No. 11-282, 2011 U.S. Dist. LEXIS 138317, at *8-9 (D.D.C. Dec. 1, 2011) (citing *Envt'l. Def. v. Leavitt*, 329 F. Supp. 2d 55, 65 (D.D.C. 2004) and FED. R. CIV. P. 24(b)). Under Rule 24(b)(2), a would-be intervenor must show "(1) an independent ground for subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action.'" *Potomac Elec. Power Co.*, 2011 U.S. Dist. LEXIS 138317, at *8 (citing *EEOC v. Nat'l Children's Ctr.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998))

(internal quotations omitted).[34]   As previously noted, the decision to allow permissive

intervention under Rule 24(b) is committed to the district court's discretion.  *Id.* (citing *Nat'l*

*Children's Ctr.*, 146 F.3d at 1046, 1048).  In exercising its discretion to allow permissive

intervention, the Court must consider whether the proposed intervention "will unduly delay or

prejudice the adjudication of the original parties' rights."  FED. R. CIV. P. 24(b).

### B.      The Movants' Claims

The nine Movants include seven former CFSA employees (Patricia Ivey, Delores

Junious, Emmanuael Mbadiugha, Sophia Mickens-Lewis, Nicky Odaka, Njideka Odiana and

Fidelia Phillips) and two current CFSA employees (Nellie Lahia and Edwin Monono).  Unlike

the plaintiffs, who complain about their treatment while employed at CPS, only three of the

Movants (Ivey, Lahai, Mickens-Lewis) were employed within this component of the CFSA.  The

other six Movants complain about their treatment in the following components of CFSA: In-

Home and Reunification Services, the Family Stabilization Branch, and the Licensing &

Monitoring Division.  Only one of the Movants served as a CFSA supervisor or manager

(Mickens-Lewis) and the remainder are non-managerial employees.  The Movants were

employed at CFSA for varying lengths of time, ranging from about eighteen years to only a few

years.  As with the nine plaintiffs, all nine of the Movants claim that they were discriminated

against on the basis of race and subjected to a hostile work environment during at least some

portion of their employment at CFSA.  In addition, six of the Movants (Junious, Mbadiugha,

Mickens-Lewis, Monono, Odiana and Phillips) claim retaliation; six Movants (Lahia,

Mbadiugha, Monono, Odaka, Odiana and Phillips) claim discrimination on the basis of national

origin; and two Movants (Mbadiugha and Monono) claim age discrimination.

---

[34] Whether standing is also required for permissive intervention in this Circuit is an unresolved issue.  *See In re Vitamins Antitrust Class Actions*, 215 F.3d 26, 31-32 (D.C. Cir. 2000); *In re Endangered Species Act Section 4 Deadline Litig.*, 277 F.R.D. 1, 8 (D.D.C. 2011); *In re ESA Litig.*, 270 F.R.D. 1, 6, n.5 (D.D.C. 2010).

According to documents submitted by the plaintiffs, Phillips has received an EEOC right-to-sue letter and three other unnamed Movants have filed charges with the EEOC but have not yet received their right-to-sue letters.  Pls.' EEOC Docs., ECF No. 30.  Apparently, the five other Movants have not filed complaints with the EEOC, let alone exhausted any administrative remedy.

The Title VII and ADEA discrimination claims asserted by each Movant are summarized in the chart below.

| Movant – CFSA Component | Discrimination based upon: | | | | Hostile Work Environment | Retaliation |
| | Race (Black) | National Origin | Age | Gender | | |
|---|---|---|---|---|---|---|
| Monono – Licensing & Monitoring Division | √ | √ (Cameroon) | √ (53) | NO | √ | √ |
| Ivey – CPS | √ | NO | NO (58) | NO | √ | NO |
| Odiana- In-Home & Reunification Services | √ | √ (Nigerian) | NO (34) | NO | √ | √ |
| Phillips– In-Home & Reunification Services | √ | √ (Nigerian) | NO (53) | NO | √ | √ |
| Mbadiugha– In-Home & Reunification Services | √ | √ (Nigerian) | √ (55) | NO | √ | √ |
| Lahai– CPS | √ | √ (Sierra Leone) | NO (62) | NO | √ | NO |
| Odaka– In-Home & Reunification Services | √ | √ (Nigerian) | NO (41) | NO | √ | NO |
| Junious– Family Stabilization Branch | √ | NO | NO (47) | NO | √ | √ |

| Mickens-Lewis– CPS Administrator | √ | NO | NO (44) | NO | √ | √ |
|---|---|---|---|---|---|---|

Just as the summary chart above reflects differences in the claims asserted by the Movants, the factual allegations underlying the claims of discrimination, hostile work environment and retaliatory actions vary among each of the nine Movants, as described in more detail below.

### 1.    Non-Managerial Movants

**Edwin Monono** is a 53-year old black man from Cameroon, who worked as a CPS caseworker in three time periods: from 1993 until 1996, from 1997 until 2001, and again from 2008 through the Spring of 2009, when he was detailed from the Licensing and Monitoring Division to CPS "due to massive backlogs following the Jacks tragedy."  First Mot., Ex. 1, Compl.-In-Intervention ("First Compl.-Int."), ECF No. 24-1, ¶¶ 20-22, 39, 48.  Monono claims racial and national origin discrimination, hostile work environment and retaliation based upon allegations, *inter alia*, that (1) his workplace is "saturated with stereotypes about Africans being dishonest, lazy, and just it in for the money," *id*. ¶ 26; (2) "American social workers made derogatory comments about the skin complexions, facial features, and accents of African caseworkers," *id*. ¶¶ 25, 27; (3) during his 2008 detail to CPS, he worked in excess of 40 hours per week but did not submit overtime pay requests because his managers accused African social workers of "stealing overtime" and threatened African social workers with audits and disciplinary actions; he nevertheless "wanted to continue working in [CPS]," *id*. ¶¶ 40-6; (4) upon his transfer back to the Licensing and Monitoring Division, he was assigned more cases than his American co-workers, *id*. ¶ 49; (5) "[i]n 2010," he complained about the "impropriety of

a particular assignment," and was "written up" by Supervisor K,[35] *id*. ¶ 50; and (6) despite requests to be transferred to other units, he remains assigned the same supervisor and "continues to be harassed," while American caseworkers who complained about the same supervisor were transferred, *id*. ¶¶ 50-53.

**Patricia Ivey** is a 58-year old African-American woman, who worked as a CPS caseworker from 2005 until she resigned in August 2008.  First Compl.-Int. ¶¶ 55-59.  Ivey claims racial discrimination and hostile work environment, which interfered with her ability to do her job, *id*. ¶¶ 97-98.  Ivey provides no allegation of any action taken against her personally, but bases her claims on her observations that (1) black caseworkers "from Africa and the Caribbean Islands, were bullied by their supervisors," *id*. ¶ 61; (2) African caseworkers were warned not to submit overtime pay requests and managers accused African social workers of "stealing overtime" and "threatened" African caseworkers with audits and disciplinary actions, *id*. ¶¶ 72-76; and (3) from 2005 to 2008, she observed Supervisor A "constantly harass a Nigerian caseworker," and a Jamaican caseworker, Angella Peters, whose repeated requests to be transferred to other units were denied, *id*. ¶¶ 83, 86, 87-91.

**Nellie Lahai** is a 62-year old black woman from Sierra Leone, who has worked for CFSA for about 18 years and as a CPS caseworker from 2003 until January, 2009, when she was "involuntarily transferred" to the Licensing and Monitoring Division.  Second Mot., Ex. 1, Compl.- in-Intervention, ECF No. 27-1 ("Second Compl.-Int."), ¶¶ 11-12, 15, 59.  Lahai claims discrimination on the basis of race and national origin, retaliation and hostile work environment, based upon allegations that (1) Supervisor H, who became CPS' program administrator in 2004, "created a lot of racial tension at the agency," *id*. ¶ 24; (2) in the Fall of 2005, Lahai filed a

---

[35] Supervisor K is unnamed and the Complaint provides no race or ethnic information about this supervisor.  *Id*. ¶ 50.

grievance against Supervisor H, who demoted Lahai, assigned her more cases than American caseworkers, and denied her overtime pay requests, *id.* ¶¶ 30-34; (3) in October, 2005, Lahai expressed concern to the agency director about Supervisor H, who was removed as CPS program administrator, but "Lahai continued to be harassed by her supervisors," *id.* ¶¶ 40-45; (5) by June, 2008, Lahai "had the largest caseload of any caseworker in Child Protective Services and [] was completely overwhelmed," but "was never fired" and "was not given anything to do for approximately six months," *id.* ¶¶ 52, 57-58; and (6) in January, 2009, after her transfer to the Licensing and Monitoring Division, Lahai continues to be treated less favorably than her American co-workers, *id.* ¶ 60.

**Njideka Odiana** is a 34-year old, black woman from Nigeria, who worked at CFSA's In-Home and Reunification Services and in the Licensing and Monitoring Division from 2001 to 2009, when she was terminated. First Compl.-Int. ¶¶ 102, 103, 105, 164. She claims racial and national origin discrimination, hostile work environment and retaliation based upon allegations that (1) between 2001 and 2003, when she was assigned to In-Home and Reunification Services, American social workers hired at the same time as she were automatically promoted upon completion of their one-year probationary period, while Odiana was not promoted for several years, *id.* ¶¶ 114-16; (2) after resigning from CFSA in 2007, she was re-hired in 2008 and assigned to In-Home and Reunification Services, instead of the assignment she expected in a collaborative position in order to have a regular schedule for her to care for her three young children, *id.* ¶¶ 127-33; (3) in February 2009, Odiana was denied transfer to a collaborative position until completion of a one year probationary period, even though some newly hired American social workers were assigned to the collaborative position, *id.* ¶¶ 141-48, 151-53, 161-64; (4) after Odiana complained about not being transferred, two supervisors, Supervisor L and

Supervisor M,[36] wrote her up in May 2009, September, 2009, and December 2009, the last of which resulted in her termination, *id*. ¶¶ 154-64.

**Fidelia Phillips** is a 53-year old, black woman from Nigeria, who, like Movant Odiana, worked at CFSA's In-Home and Reunification Services from to 2001 to 2008.  First Compl.-Int. ¶¶ 168-69.  She claims racial and national origin discrimination, hostile work environment and retaliation based upon allegations that (1) after taking family leave, in May 2004, her Supervisor N[37] was "visibly hostile" towards her, prompting Phillips to complain to the project manager and program administrator about the hostile treatment, *id*. ¶¶ 185-91; (2) in December, 2004, a new supervisor ("Supervisor O")[38] was also hostile towards her but gave her a "satisfactory" job performance with "very derogatory comments," which prompted her to request a transfer to another supervisor but her request was denied, while "two American caseworkers" were transferred after complaining about Supervisor O, *id*. ¶¶ 194-204; (3) between 2006 and 2008, Phillips was assigned a "significantly heavier [caseload]" than her American co-workers, requiring her to work long hours, but the agency consistently refused to approve Phillips' overtime pay requests, *id*. ¶¶ 206-08; and (4) after a family leave in 2005, despite Supervisor O's advice not to file "an interim report," Phillips was reprimanded for not having filed the report, which was the "first of several questionable write ups that would result in Phillips' termination in 2008," *id*. ¶¶ 210-14.

---

[36] Supervisor L is Elaina McKenzie and Supervisor M is Maura Gaswirth.  The First Complaint-in-Intervention provides no race or ethnic information about either of these supervisors.  *Id.* ¶¶ 154, 157.

[37] Supervisor N is Diane Robinson, about whom the First Complaint-in-Intervention provides no race or ethnic information.  *Id.* ¶ 180.

[38] Supervisor O is Haylee Liss, about whom the First Complaint-in-Intervention provides no race or ethnic information.  *Id.* ¶ 196.

**Emmanuel Mbadiugha** is a 55-year old black man from Nigeria, who worked for CFSA's In-Home and Reunification Services, from 1998 until June 2010, when he was terminated.  First Compl.-Int. ¶¶ 219-20, 223, 269.  He claims racial, age and national origin discrimination, hostile work environment and retaliation based upon allegations that (1) black caseworkers, particularly those from Africa and the Caribbean Islands, were bullied by their supervisors and American social workers made derogatory comments about African workers, *id.* ¶¶ 217-18, 246; (2) he was assigned a heavy caseload relative to his American co-workers but his supervisors discouraged him from making overtime pay requests, *id.* ¶¶ 245-49; (3) in 1999, his Supervisor P[39] became hostile towards him when he left work for his child's birth, *id.* ¶¶ 241-43; (4) Mbadiugha's requests in 2003 for transfer to CPS and, in 2004, for a supervisor's position were denied, *id.* ¶¶ 248-57; (5) between 2005 and 2008, Mbadiugha was written up twice by Supervisor Q[40] for being late for a court hearing and late filings of case plans with the court, each resulting in a suspension, even though "caseworkers are rarely disciplined" for these matters, *id.* ¶¶ 262-66; and (6) in 2010, Mbadiugha's new supervisor R[41] wrote up Mbadigha for filing case plans with the court after a deadline, which resulted in his termination, *id.* ¶¶ 267-69.

**Nicky Odaka** is a 41-year old black woman from Nigeria, who has worked for ten years as a social services assistant in CFSA's In-Home and Reunification Services.  Second Compl.-Int. ¶¶ 62, 64-67.  She claims racial and national origin discrimination, and hostile work environment based upon allegations that (1) she routinely worked over 40 hours per week but did

---

[39] Supervisor P is Theresa Cunningham, about whom the First Complaint-in-Intervention provides no race or ethnic information.  *Id.* ¶ 241.

[40] Supervisor Q is Andrea Brunson, about whom the First Complaint-in-Intervention provides no race or ethnic information.  *Id.* ¶ 262.

[41] Supervisor R is Madeline Jackson-Cooper, about whom the First Complaint-in-Intervention provides no race or ethnic information.  *Id.* ¶¶ 267-68.

not submit overtime pay requests because her unnamed supervisor discouraged her from doing so, *id.* ¶ 73; (2) she observed that African caseworkers were assigned more cases than American counterparts, were blamed and disciplined when excessive caseloads led to problems, and "routinely heard American co-workers making derogatory comments about Africans," including "criticiz[ing] African complexions, facial features and accents," *id.* ¶¶ 69-79.

**Delores Junious** is a 47-year old black woman, who has been terminated twice from CFSA's Family Stabilization Branch, first in 2001 and again in 2008. Second Compl.-Int. ¶¶ 87-90. She claims racial discrimination, hostile work environment and retaliation based upon allegations that: (1) in April and May 1999, Junious "advocated on behalf" of a new co-worker in the Family Stabilization Branch and complained to management about discriminatory assignment of more cases to an entry-level African American social worker than to experienced white social workers, by her white supervisor, Supervisor S,[42] *id.* ¶¶ 82, 92-100; (2) in late 1999, Junious was harassed and disciplined by her new black supervisor, Supervisor T,[43] prompting Junious to complain to management and leading to her 2002 termination, *id.* ¶¶ 101-06; (3) following her reinstatement in 2005, Jurious was assigned to the training unit, "not given a regular assignment," not promoted to a grade 12 and "never allowed to work overtime," *id.* ¶¶ 108-13; and (4) "despite having hundreds of hours of leave," the agency refused to recognize her leave and "declared her Absent without Leave (AWOL) despite pre-approving her leave requests," leading to her second termination in 2008, *id.* ¶¶ 114-15.

## 2.     Managerial Movant

One of the Movants, **Sophia Mickens-Lewis,** was a senior manager and acting program administrator at CPS during the time period when the plaintiffs and Movants claim that

---

[42] Supervisor S is Donna Geraci. Second Compl.-Int. ¶ 92.

[43] Supervisor T is Emma Norfleet. *Id.* ¶ 101.

discriminatory and retaliatory conduct occurred.  Mickens-Lewis complains about a hostile work environment during the time that her immediate supervisor was plaintiff Courts-Marshall.

Mickens-Lewis is a 44-year old African American woman, who worked in CPS as a supervisor from 2000 to 2001, as a program manager from 2002 to 2003, as the acting program administrator from 2003-2004, and as a program manager from 2004 to 2008, during which time in the fall of 2005, she served as the CPS acting program administrator, when Courts-Marshall was her immediate supervisor.  First Compl.-Int. ¶¶ 276-85.  She claims racial discrimination, hostile work environment from 2004 to 2008, and retaliation based upon allegations that (1) in January 2006, the deputy director of the CFSA, Supervisor I, instructed Courts-Marshall to terminate "about 15 social workers," but Mickens-Lewis, together with Courts-Marshall and Supervisor B, "determined that the social workers on the termination list were performing they [sic] jobs well but had complained about [Supervisor H's] discriminatory practices," *id*. ¶¶ 296-310, 326; (2) on two occasions, in 2007 and 2008, Supervisor I directed Mickens-Lewis to terminate apparently two different African caseworkers, one of whom was the subject of a "a complaint from a family he was investigating," but after investigation, Mickens-Lewis refused to terminate the caseworkers, *id*. ¶¶ 332, 335, 351-52; and (3) in May, 2008, Supervisor I terminated Mickens-Lewis because "[y]ou all did not do what I told you to do," *id*. ¶¶ 360-63.

### C.   Discussion

The Movants argue that they should be permitted to intervene "because Intervenors and Plaintiffs share common claims against Defendant in terms of facts, evidence, and legal theories."  First Compl.-Int., at 2.  Specifically, the Movants state that both the Movants and plaintiffs allege they worked "in a hostile work environment at the Child and Family Services Agency during the past ten years.  The hostile work environment was discriminatory and

retaliatory."  Movants' Reply Mem., ECF No. 29, at 1-2; Movants' Reply Mem., ECF No. 26, at

2.

The Defendant counters that the pending motions to intervene should be denied since

each Movant has "an independent right of action that he or she can pursue regardless of the

outcome of this proceeding."  Def.'s Opp'n to First Mot., ECF No. 25, at 2-3; Def.'s Opp'n to

Second Mot., ECF No. 28, at 2-3.  Consequently, according to the defendant, the Movants cannot

make the requisite showing that, absent intervention, their interests would be impeded or

impaired under Rule 24(a)(2).  In addition, the defendant argues that permissive intervention

under Rule 24(b) should be denied because joining the Movants' "legally distinct" claims would

"expand the scope of the issues before the Court and delay the current proceedings."  Def.'s

Opp'n to First Mot. at 3; Def.'s Opp'n to Second Mot. at 4.  Even if these motions were not

moot, for these and other reasons discussed below, the Court agrees with the defendant that the

Movants would not be permitted to intervene.

### 1.    Movants Would Not Be Entitled to Intervene Of Right

The defendant does not dispute that the Movants have standing[44] nor their satisfaction of

the first and last requirements for intervention of right under Rule 24(a)(2), and the Court agrees

that, if not moot, the Movants' intervention motions would be timely and their interests would

not be adequately represented by the existing parties.  The defendant argues only that Movants

cannot meet either the second or third requirements for intervention as of right.  *See* Def.'s

Opp'n to Second Mot. at 2-3.  Specifically, the defendant contends that the Movants do not have

---

[44] A prospective intervenor's Article III standing presents a question going to this Court's jurisdiction, which must be addressed first by the Court before proceeding to consideration of the four-part test for intervention of right. *See In re Endangered Species Act Section 4 Deadline Litig.*, 277 F.R.D. 1, 5 (D.D.C. 2011); *see also Fund for Animals*, 322 F.3d at 732; *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).  The Court concludes that the Movants have met the "irreducible constitutional minimum" of standing by showing a concrete injury causally connected to their employment at the CFSA that could be redressed by a favorable decision from this Court. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

an interest in the subject matter at issue in the action and that the Movants' interests would not as a practical matter be impaired or impeded by the disposition of the case.  The Court agrees that the Movants would not be able to satisfy these requirements and, therefore, their motions to intervene of right would be denied on the merits.

First, the Movants have no legally cognizable interest in the specific claims asserted by the plaintiffs in this employment discrimination lawsuit.  While the Movants may share with the plaintiffs similar legal claims against the same defendant, the factual sufficiency of each claim would be assessed for each plaintiff and movant individually.  Indeed, the Movants concede "the individual nature of the discrimination/retaliation claims" when they argue that "the interests of the Intervenors cannot be adequately protected by the current parties to the litigation."  First Mot. at 2; Second Mot. at 1.

Second, even if the Movants had a legally cognizable interest, that interest would not be impaired by a judgment on the plaintiffs' claims.  Impairment exists when the decision in a pending matter would foreclose or adversely affect the rights of the proposed intervenor in a subsequent proceeding.  Even if one or more plaintiffs would have prevailed with a judgment in his or her favor, the legal interests and claims of the Movants would, as a practical matter, be unaffected.  As the defendant correctly points out, each Movant has "an independent right of action that he or she can pursue regardless of the outcome of this proceeding."  Def.'s Opp'n to Second Mot., ECF No. 28, at 3.  *See Shea v. Angulo*, 19 F.3d 343, 347 (7th Cir. 1994) (where proposed intervenor is free to initiate own suit for recovery no matter whether plaintiff prevails, there is no potential impairment of intervenor's interest); *In re Safeguard Scientifics*, 220 F.R.D. 43, 48-49 (E.D. Pa. 2004) (denying motion to intervene as of right because impairment

requirement was not met where proposed intervenors "remain[ed] free to assert their claims by filing individual civil actions against [the defendant]").

In connection with the impairment factor, the Court is cognizant that if the Movants individually filed their own complaints for employment discrimination, at least five may be unsuccessful.  The record is bare of any evidence that five of the Movants filed a discrimination charge with the EEOC, received a right-to-sue letter from the EEOC or otherwise exhausted their administrative remedies.  Thus, if non-filing Movants attempt to file individually the claims asserted in the First and Second Complaints-in-Intervention, the effort may be futile and their claim would be subject to dismissal for failure to exhaust their administrative remedies.  This impairment would not be due to the disposition of this action, however, but to the Movants own action or inaction and therefore is not the type of impairment that Rule 24(a) was intended to protect against.  *See United States v. New York*, 198 F.3d 360, 366 (2d Cir. 1999) ("Any failure on their part to act within the applicable statutes of limitations does not sufficiently impair their interests to warrant intervention under Rule 24(a)(2); rather, the harm to their interests must be attributable to the court's disposition of the suit in which intervention is sought."); *Jones v. GES Exposition Servs.*, No. 02-6243, 2004 U.S. Dist. LEXIS 17981, at *27 (N.D. Ill. Sept. 3, 2004) ("[E]ven if the intervenors were barred from bringing a separate action . . . as to their Title VII claims, for failure to timely file a charge . . . this would not constitute a sufficient impairment of interests within the meaning of Rule 24(a) because the harm would not be due to the disposition of this action.").

Indeed, the claims of the non-filing Movants would be subject to challenge for failure to exhaust their administrative remedies, just like the claims of the non-filing plaintiffs.  Although neither the defendant nor the Movants address this issue, the non-filing Movants presumably

would seek to excuse their failure to exhaust their administrative remedies for their employment discrimination claims by relying on vicarious exhaustion, just as the non-filing plaintiffs have done. *Cf. James v. England*, 332 F. Supp. 2d 239, 248 (D.D.C. 2004) ("[T]he District of Columbia Circuit has permitted intervention in Title VII class action lawsuits by parties even if they have not exhausted their administrative remedies."). The five non-filing Movants, however, would be no more entitled to vicarious exhaustion than the non-filing plaintiffs, for whom vicarious exhaustion is not available due to the disparate nature of their legal and factual claims, as discussed in section IV. A. 3, *supra*. Their divergent factual allegations make amply clear that the EEOC could not have had notice of the Movants' claims based upon the EEOC charges filed by the three plaintiffs who exhausted their administrative remedies. Thus, the Movants would not be able to rely upon the "single-filing" rule to assert their claims. *Accord Kifafi v. Hilton Hotel Ret. Plan*, No. 98-1517, 2004 U.S. Dist. LEXIS 28928, at *16-17 (D.D.C. Sept. 27, 2004) (denying motion to intervene in ERISA suit  where plaintiff's exhaustion "does not excuse Intervenors own failure to do so," since movants' claims differ in nature from plaintiff's claims).

In sum, the Court finds that, even if these motions were not moot, the Movants would have failed to meet the requirements for intervention of right.

## 2.     Permissive Intervention Would Not Be Warranted

As an alternative ground, the Movants contend that the Court should exercise its broad discretion for permissive intervention under Rule 24(b)(2) and grant their motions to intervene. Even if the motions to intervene were not moot, the Court would decline to allow permissive intervention. For permissive intervention, the Movants must show that they share with the main action a common question of law or fact, and the Court "must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." FED. R. CIV. P. 24(b)(1)(B) & (3). The Movants would satisfy neither of these requisite showings.

The Movants acknowledge the differences in the factual allegations among each of the Movants and the plaintiffs, stating that the claims of each "present[] their unique experience." Movants' Reply Mem., ECF No. 29, at 2; Movants' Reply Mem., ECF No. 26, at 2. Nonetheless, the Movants contend that these conceded differences militate *in favor*, not against, intervention because together each "plaintiff and/or intervenor adds a piece to a complex puzzle" that "portray[s] a hostile work environment." *Id.* The Court disagrees.

Close examination of the Movants' claims make clear that they do not sufficiently share common questions of law or fact in common with each other or the main action that these claims could be efficiently considered together. Other courts have similarly denied intervention in discrimination cases for failure to show a common question of law or fact "where they allege disparate treatment claims that are unique to each individual complainant." *Jones*, 2004 U.S. Dist. LEXIS 17981, at *32 (citing *Seils v. Rochester City School District*, 199 F.R.D. 506, 512 (W.D.N.Y. 2001) ("The fact that a plaintiff may attempt to introduce evidence relating to the treatment of a proposed intervenor at trial in the instant matter does not create 'common issues of law or fact' warranting intervention.")).

Despite the limited overlap in the factual allegations and legal claims of the Movants and plaintiffs, the fact remains that each asserts particular individual circumstances. The Movants' claims largely relate to different CFSA units, different supervisors, different allegedly discriminatory and retaliatory actions, and different adverse actions than the plaintiffs. For example, while all of the plaintiffs complain about their treatment in the CPS component of CFSA, six of the Movants allege discriminatory treatment by other units, including In-Home and Reunification Services, the Licensing & Monitoring Division and the Family Stabilization Branch. *See Bergman v. Snow*, No. 06-303, 2008 U.S. Dist. LEXIS 109274, at *2-3 (D.D.C.

July 10, 2008) (motion to intervene in disability discrimination suit denied as having "no merit" where movant claimed to "suffer from similar psychiatric disorders" as plaintiff but worked in "entirely different parts of the Agency").  The three Movants who did work in CPS complain about entirely different actions than the plaintiffs.  Outlined below are several examples:

- Movant Ivey describes her alleged observations of African caseworkers being warned not to submit overtime payments, but this is simply not a central claim made by any plaintiff.

- Movant Lahai complains about being completely overwhelmed by her workload in 2008 after the Jacks tragedy, but unlike the plaintiffs who complained that they were penalized with poor work evaluations for their backlogs, Lahai claims she was given nothing to do and then was transferred to another unit.

- Movant Mickens-Lewis describes the demand from the CPS Deputy Director, Supervisor I, to terminate an African caseworker due to a complaint from a family he was investigating, but she nowhere alleges that the termination request was due to a discriminatory or retaliatory reason.  Unlike the plaintiffs' claims of retaliation for engaging in protected activity, Mickens-Lewis' claim that she was terminated for not complying with Supervisor I's instructions to fire a caseworker who was the subject of a complaint, does not appear to involve any allegation of underlying discrimination against her or retaliation for engaging in protected activity.

The differences in each Movant and plaintiff's experiences would unduly complicate and confuse the circumstances that apply to each party.  For example, the Movants complain about Supervisors K through T, wholly different supervisors than A through J, whose actions are the source of the plaintiffs' complaints.  In total, at least twenty different supervisors at various management levels in various CFSA components are alleged to have engaged in discriminatory or retaliatory actions against different Movants and the plaintiffs.  Keeping track of which supervisor took an allegedly illegal action against a particular plaintiff or Movant would lead to unnecessary confusion.

The differences in the nature of the alleged actions underlying different legal claims would also raise a significant risk of engendering potential prejudice not only to the defendant

but also to the claims of the Movants or plaintiffs.  For example, certain Movants, such as Monono and Mbadiugha, claim age discrimination, even though other Movants (*e.g.*, Ivey and Lahai) and plaintiffs (*e.g.*, McCall and Meade), who are *older* than Monono and Mbadiugha, do not assert claims for age discrimination.  In addition, certain Movants, such as Ivey, describe allegedly discriminatory actions taken against other CFSA employees but not against her personally, while other Movants claim denial of overtime pay and other allegedly adverse actions taken against them.  As the defendant accurately points out, "[a]llowing movants to intervene in this suit will expand the scope of the issues . . . and delay the current proceeding."  Def. Opp'n to Second Mot. at 4.

Accordingly, even if these motions were not moot, the Court would deny the Movants' motions to intervene of right or permissively.

## VI.    CONCLUSION

For the foregoing reasons, the defendant's Motion to Dismiss the Second Amended Complaint will be GRANTED, and the plaintiffs' two pending Motions to Intervene will be DENIED.  This case will be dismissed.

A separate order consistent with these findings and conclusions of law shall accompany this Memorandum Opinion.


**DATED: April 16, 2012**

/s/ *Beryl A. Howell*
BERYL A. HOWELL
United States District Judge